*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 07-5431

JOSE EDUARDO URRIETA,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00154—Todd J. Campbell, Chief District Judge.

Argued: January 30, 2008

Decided and Filed: March 20, 2008

Before: GUY, GILMAN, and McKEAGUE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Courtney D. Trombly, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael C. Holley, Ronald C. Small, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Brent A. Hannafan, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

GILMAN, J., delivered the opinion of the court, in which GUY, J., joined. McKEAGUE, J. (pp. 10-14), delivered a separate dissenting opinion.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Jose Eduardo Urrieta appeals the district court's denial of his motion to suppress evidence. During a routine traffic stop, Deputy Sheriff Lee Young detained Urrieta beyond the time reasonably necessary to issue a citation, primarily because the officer mistakenly believed that Urrieta was not allowed to drive in Tennessee with a Mexican driver's license. Deputy Young claims that, during the course of the traffic stop, he became suspicious that Urrieta was transporting drugs. Eventually Urrieta gave Deputy Young written consent to search his vehicle. The deputy discovered no drugs, but found three handguns and several fraudulent identification cards. Finding that Deputy Young had a reasonable suspicion to extend the detention and that Urrieta's consent was voluntary, the district court denied Urrieta's

1

motion to suppress.  For the reasons set forth below, we **REVERSE** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

On August 21, 2006, Urrieta, his girlfriend Maria Ramirez Montes, and her sixteen-year-old son were traveling eastbound on Interstate 24 in Tennessee.  Urrieta was driving a 1998 Lincoln Navigator with an expired temporary registration tag and was towing a 1987 Honda sedan by means of a homemade towbar.  Both vehicles were fully packed.  At approximately 1:45 p.m., Deputy Young, an officer with the Rutherford County Interstate Crime Enforcement Unit, was stationed on Interstate 24.  Deputy Young was trained in using drug-sniffing dogs, in interdiction, and in using highway traffic stops as a means to ferret out concealed secondary crime.  On the day in question, a trained drug-sniffing dog was in Deputy Young's patrol car.  Deputy Young witnessed Urrieta's car "swerving" between lanes, decided to follow it, and noticed that the Navigator did not have a valid registration sticker and that the taillights on the Honda were not working.  On that basis, Deputy Young pulled Urrieta over to the side of the road.

The entire traffic stop was captured on video.  Deputy Young approached Urrieta's car at 1:49 p.m. and requested to see Urrieta's driver's license.  Upon noticing that the vehicles were fully packed, the deputy asked Urrieta: "Y'all moving?"  Urrieta responded that he was moving from California and going to Atlanta.  Over the course of the stop, however, Urrieta eventually explained that his ultimate destination was West Palm Beach, Florida.  Deputy Young noted that Urrieta was smiling and friendly, but that the two passengers in the car did not make eye contact with him and appeared nervous.  The officer also noticed that Montes was wearing a waitress's shirt.

Urrieta produced a Mexican driver's license and temporary registration papers from California for the Navigator.  The Navigator was registered to Montes, but the registration had expired in February of 2006, six months earlier.  Urrieta then produced additional paperwork showing that the Honda was registered in his name.  Deputy Young told Urrieta that he could not drive in Tennessee using a Mexican driver's license unless he had a valid passport, asked Urrieta if he was "legally in the country," and instructed him to search his fully packed car to find his passport.

At approximately 1:53 p.m., Deputy Young returned to his vehicle and called the El Paso Intelligence Center (EPIC) to determine if Urrieta was legally in the country.  EPIC provides information on drivers' licenses, car registrations, and whether an individual has crossed the border at a checkpoint, was deported, or is under federal investigation.  At 2:04 p.m., EPIC reported to Deputy Young that there was no information in the system on Urrieta, Montes, or their vehicles.  The lack of information suggested that Urrieta and Montes had not entered the country legally, but also confirmed that they had not been previously deported.  This is significant because illegal reentry after deportation is the only immigration violation that Deputy Young had the authority to enforce.

While waiting for the EPIC report, Deputy Young wrote a traffic citation for Urrieta, noting that Urrieta had committed three offenses: a lane violation, a taillight violation, and a registration violation.  Deputy Young then called for backup from other officers, stating that he wanted to search the vehicles.

At 2:07 p.m., Deputy Young returned to Urrieta's car and asked him a series of approximately 40 questions about his immigration status, moving plans, job, and criminal history.  Deputy Young did not issue Urrieta a citation or return his driver's license.  In response to Deputy Young's questions, Urrieta was evasive about when he came into the country and, according to Young, began to change his story about his travel plans.  Urrieta stated that he was "going back" to

Mexico, that he planned to stay in Atlanta for only a short period of time, and then finally explained that he was going to Florida. He also stated that his girlfriend worked at Wendy's, that she did not speak English, and that he did not have steady work.

When Deputy Young asked Urritea if his girlfriend had a passport, Urrieta said that he did not know. Although Urrieta originally asserted that he had a tourist visa, he admitted upon further questioning that he had only a passport. Deputy Young then asked Urrieta about his criminal history, and Urrieta said that he had none. Urrieta also denied having any illegal drugs or loaded guns in the car. In response to further questioning, however, Urrieta told Deputy Young that he did not know for sure if there had "ever" been drugs in the car, but stated that he did not "think so."

At approximately 2:13 p.m., Deputy Young asked Urrieta if he could search his car. Urrieta responded "sure," at which point Deputy Young handed Urrieta a consent form and told him that the form gave law enforcement permission to search the car for illegal items. Deputy Young then told Urrieta to read over the form and to sign it, stating that he wanted Urrieta to "know what I'm doing." The consent form was in English and in Spanish and stated in part: "I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form."

Another officer arrived at the scene and Deputy Young walked over to speak with him. The two officers then approached Urrieta's car and the new officer began to question Montes while Deputy Young spoke with Urrieta. Urrieta had filled out the consent form, which gave consent for the officer to search only the Honda. Deputy Young then explained to Urrieta that he wanted to search the Navigator too, and instructed him "to just put '98 Navigator' on there." Urrieta complied with Young's instructions and amended the form to include the notation "98 Nav." At 2:19 p.m., half an hour into the stop, Deputy Young and the other officer began to search the Navigator. The search uncovered three firearms and several fraudulent identification cards. Urrieta's passport was discovered in the vehicle by the police in a subsequent search.

## B.      Procedural background

In August of 2006, a federal grand jury returned a two-count indictment against Urrieta for being an illegal alien in possession of firearms, in violation of 18 U.S.C. §§ 922(g) and 924, and for possession of unlawful identification documents, in violation of 18 U.S.C. § 1028(a)(6). Urrieta moved to suppress the firearms, documents, and several incriminating statements. The district court granted Urrieta's motion to suppress certain of the statements, but it denied the motion to suppress the evidence obtained in the search after finding that (1) Deputy Young had a reasonable suspicion to detain Urrieta after 2:07 p.m., and (2) Urrieta voluntarily consented to the search. Urrieta entered a conditional plea of guilty in February of 2007 that preserved his right to appeal the suppression ruling. The court then sentenced Urrieta to one year and one day in prison, followed by two years of supervised release. This timely appeal followed.

## II.  ANALYSIS

## A.      Standard of review

We review a district court's decision on a motion to suppress evidence under two "complementary standards." *United States v. Miller*, 314 F.3d 265, 267 (6th Cir. 2002). The district court's factual findings will be upheld unless they are clearly erroneous, but its legal conclusions are reviewed de novo. *United States v. Combs*, 369 F.3d 925, 937 (6th Cir. 2004). A factual finding is clearly erroneous when, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been committed. *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (citations omitted).

**B.      The Fourth Amendment and the reasonable-suspicion standard**

*1.      Seizure*

The Fourth Amendment is violated when an individual is unlawfully seized. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that the Fourth Amendment is violated by an unlawful seizure); *United States v. Saperstein*, 723 F.2d 1221, 1224-25 (6th Cir. 1983) (stating that the first question in a Fourth Amendment analysis is whether the party was seized). A seizure is unlawful if an officer, without a reasonable suspicion, "by means of physical force or show of authority . . . in some way restrain[s] the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968).

The parties in the present case do not dispute that Urrieta was "seized" during the entire encounter. We therefore turn to the question of whether Deputy Young had a reasonable suspicion to extend the stop.

*2.      Reasonable suspicion of criminal activity*

A law enforcement officer may permissibly conduct an investigatory stop when he or she has "a particularized and objective" suspicion that criminal activity is afoot. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). To meet this standard, the government must point to "specific and articulable facts, which taken together with rational inferences from those facts," reasonably suggest than criminal activity has occurred or is imminent. *Terry*, 329 U.S. at 21. An officer must not act on an "inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences from which he is entitled to draw from the facts in light of his experience." *Id.* at 27. Courts determine whether a reasonable suspicion exists by looking at the "totality of the circumstances" and considering "all of the information available to law enforcement officials at the time." *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003).

The parties in the present case do not dispute that the initial traffic stop was valid. At issue is whether, at the conclusion of the traffic stop at 2:07 p.m., Deputy Young had a reasonable nonimmigration-related suspicion for the continued investigatory detention of Urrieta.

To detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (finding that the police lacked a reasonable suspicion of criminal activity to continue an investigatory detention after the traffic stop was completed). This Court has determined that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (finding that the officer had a reasonable suspicion of criminal activity, which allowed him to detain a motorist in order for a drug-detection dog to conduct a sniff search).

Urrieta's argument that Deputy Young lacked a reasonable suspicion to extend the scope of Urrieta's detention is two-fold. He first asserts that Deputy Young impermissibly detained him beyond the scope of the traffic stop due to the deputy's mistaken understanding of the law (i.e., that Urrieta's Mexican driver's license was not valid without a passport and that Urrieta had to produce a passport in order to legally drive in Tennessee). Urrieta further argues that, at the time the traffic stop should have been completed (2:07 p.m.), Deputy Young lacked a reasonable suspicion that any other criminal activity was afoot, so that the remainder of the stop violated the Fourth Amendment.

In its response to Urrieta's motion to suppress evidence, the government originally argued that Urrieta's extended detention was justified on the grounds that his Mexican driver's license was invalid and that Deputy Young had reason to suspect that Urrieta was an undocumented immigrant.

The government withdrew these arguments, however, after conceding that they misstated the law. *See* Tenn. Code Ann. § 55-50-304(4) (providing that a resident of any state or country may operate a motor vehicle in Tennessee with a valid license issued by the person's home state or country); Tenn. Code Ann. § 40-7-103(a)(1) (allowing officers to conduct warrantless arrests for immigration violations only for felonies or continuing violations, thus prohibiting warrantless arrests for misdemeanors such as an illegal entry that was not committed in the presence of the officer); *State v. Ash*, 12 S.W.3d 800, 804 (Tenn. Crim. App. 1999) (finding that the police may conduct warrantless arrests for misdemeanors only if the misdemeanor was committed in the presence of an officer of the law); *see also* 8 U.S.C. § 1325 (establishing that improper entry into the United States by avoiding inspection is a misdemeanor); 8 U.S.C. §§ 103(a)(10) and § 1357(g) (stating that local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions that are not applicable in the present case).

To justify Urrieta's extended detention then, the government must point to specific facts demonstrating that Deputy Young had a reasonable suspicion that Urrieta was engaged in some nonimmigration-related illegal activity. The government contends that, at the time the traffic stop was effectuated, Deputy Young had acquired a reasonable suspicion that Urrieta was transporting drugs that was distinct from the officer's mistaken understanding of the law relating to Urrieta's right to drive in Tennessee.

Deputy Young's testimony and actions, however, belie the governments's assertion that he had a nonimmigration-related reason for Urrieta's continued detention. The deputy's testimony at the suppression hearing made clear that he conducted the entire stop under the mistaken belief that Urrieta's Mexican driver's license was invalid. Based on this mistaken belief, Deputy Young incorrectly (1) informed Urrieta that he (Deputy Young) was required to inquire into Urrieta's immigration status, (2) told Urrieta that he had to produce a passport to drive legally in Tennessee, and (3) ordered Urrieta to search his fully packed car for his passport. Deputy Young's actions strongly suggest that his mistaken understanding of the law was the true reason that he detained Urrieta beyond 2:07 p.m. on the day in question.

Further proof that Deputy Young lacked a reasonable suspicion that Urrieta was involved in a drug-related crime can be found in Deputy Young's decision not to use the trained drug-sniffing dog that was sitting in his patrol car during the course of the entire stop. If Deputy Young had suspected Urrieta of a drug-related crime, the most logical thing for the deputy to have done would have been to use the trained dog to confirm his suspicions. Deputy Young's failure to do so strongly suggests that he did not have a reasonable suspicion that Urrieta was transporting drugs.

The government, however, argues that the following factors demonstrate that Deputy Young had a reasonable suspicion that Urrieta was involved in a drug crime: (1) Urrieta's cars were fully packed and he was towing a second car, (2) Urrieta had a Mexican driver's license, (3) the Navigator had an expired registration tag, (4) Urrieta fit the profile of a drug courier because his passengers appeared nervous, he was traveling from a drug-source state, and the Navigator and the Honda had different values, (5) Urrieta had been dishonest about his immigration status, and (6) Urrieta could not find his passport.

Based on these factors, the district court determined that "a concern about [Urrieta's] general dishonesty" and the need to determine "if something else was going on in the car other than . . . traveling to Atlanta" provided a reasonable suspicion to extend Urrieta's detention beyond the traffic stop. We respectfully disagree.

Although the government finds it suspicious that Urrieta's cars were "fully packed" and that he was towing another car, we are puzzled as to why either of these factors suggests that Urrieta was

transporting drugs.  Towing a second car while traveling with one's girlfriend and her son in fully packed automobiles seems far more consistent with moving—the very explanation that Urrieta gave for his trip—than with drug running.   Because these two factors are wholly innocent and more in line with Urrieta's explanation for his trip than with the deputy's assertion that Urrieta was a drug courier, they should be entitled to little if any weight in the reasonable-suspicion calculation.

Other factors cited by the government—that Urrieta had a Mexican driver's license, was unable to find his passport, and had an expired registration—are largely irrelevant to the determination of whether Deputy Young had a reasonable suspicion that Urrieta was a drug courier. As mentioned above, the government now concedes that noncitizens may legally drive on Tennessee roads with a foreign driver's license and without a passport.  And even if Urrieta's Mexican driver's license and his failure to produce his passport might have provided a reasonable suspicion to believe that an immigration violation had occurred, neither factor suggests that Urrieta was transporting drugs.

The dissent also asserts that Urrieta was lying about having a valid driver's license and passport.  But neither Deputy Young nor the government have produced any evidence that either document was invalid.  Deputy Young in fact admitted at the suppression hearing that he looked at the expiration date of Urrieta's license and did not remember anything that suggested a problem. And although Urrieta was unable to locate his passport in his fully packed car when Deputy Young demanded it on the side of the road, the record shows that Urrieta's passport was later discovered in the car.  Finally, Urrieta's expired car registration is equally unrepresentative of additional illegal activity.  A lapsed registration tag may be a valid reason for a stop, but it is not, without more, a valid reason to suspect that a drug crime is underway.

The government further asserts that a reasonable suspicion was established because Deputy Young, with his training and experience, identified factors suggesting that Urrieta fit the profile of a drug courier.  Standard drug-courier profiles, however, are highly problematic because they often "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation [as the profile] could justify a seizure." *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *see also United States v. Millan*, 912 F.2d 1014, 1018 (8th Cir. 1990) (holding that the drug-courier profile by itself does not establish a reasonable articulable suspicion); *United States v. Carrasquillo*, 877 F.2d 73, 76 (D.C. Cir. 1989) (same).

This is not to say that the factors from the drug-courier profile cited by Deputy Young are entitled to no weight.  An officer's reasonable suspicion may be based on characteristics that include factors from a profile, so long as the suspicion is accompanied by other evidence.  *United States v. Sokolow*, 490 U.S. 1, 8-11 (1989) (relying on factors in a drug-courier profile and noting that the factors contained in a profile may have independent evidentiary weight and should be considered in the context of the totality of the circumstances).  But courts should hesitate before "rely[ing] too much on the drug courier profile because it lists behavior which can be attributed to perfectly legal activities, as well as illicit ones." *United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency*, 985 F.2d 245, 249 (6th Cir. 1993); *see also United States v. Saperstein*, 723 F.2d 12, 1227-29 (6th Cir. 1983) (questioning the use of characteristics from the drug-courier profile to establish a reasonable suspicion).

The government relies on three factors that Deputy Young asserted were consistent with the drug-courier profile: (1) Urrieta was traveling from California (a source state for drugs) to Atlanta, (2) the passengers in the car appeared to be nervous, and (3) the value of the Navigator that Urrieta was driving was greater than the value of the Honda that he was towing.  We address each factor in turn.

First, the government cites the fact that Urrieta was traveling from California, a drug-source state, to Atlanta. As this court has noted, however, travel between population centers is a relativity weak indicator of illegal activity because there is almost no city in the country that could not be "characterize[d] as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center." *United States v. Andrews*, 600 F.2d 563, 567 (6th Cir. 1979); *see also United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002) (holding that a trip between Chicago, Illinois and Columbus, Ohio does not give rise to a reasonable suspicion that the traveler is transporting drugs); *Saperstein*, 723 F.2d at 1228 (holding that travel to and from a source city is such innocent behavior that it is entitled to little weight in a Fourth Amendment analysis).

California is the most populous state in the country, being the home of more than 35 million people. Travel between California and the major population hub of Atlanta, therefore, does not add any significant weight to Deputy Young's suspicion that Urrieta was engaged in transporting drugs. And although the dissent notes that Urrieta's travel between California and Tennessee was of a "relatively quick duration," we are unclear as to why traveling without interim stops for sightseeing or other diversions is an indication of drug activity. One would hardly expect a leisurely pace of travel when three people are moving across the country in two fully packed cars, one towing the other.

The government next suggests that the "nervousness" of Urrieta's passengers contributed to Deputy Young's suspicions of illegal activity. Although nervousness may be considered as part of the overall circumstances giving rise to a reasonable suspicion, this court has found nervousness inherently *unsuspicious,* and has therefore given it very limited or no weight in the reasonable-suspicion calculation. *See, e.g.*, *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (holding that nervousness is "an unreliable indicator [of illegal activity], especially in the context of a traffic stop," because many citizens become nervous when stopped by police "even when they have nothing to fear or hide"); *Andrews*, 600 F.2d at 566 (refusing to consider nervousness in the reasonable-suspicion calculation because nervousness is entirely consistent with innocent behavior among travelers, and holding that, without additional evidence of wrongdoing, nervousness is entitled to no weight).

In the present case, there is a clear nondrug-related reason why Urrieta's passengers were nervous. Deputy Young admits that he suspected Urrieta and his girlfriend were in the country illegally, that he asked numerous immigration-related questions, and that he demanded to see Urrieta's passport. The immigration-related focus of Deputy Young's questioning easily explains the nervous behavior of Urrieta's girlfriend and her sixteen-year-old son. Deputy Young acknowledged as much when he testified that often when "dealing with Hispanics, a lot of time they are . . . scared of the police." Under these circumstances, the nervousness of Urrieta's passengers is a virtually nonexistent indicator of drug activity.

The government also suggests that a working-class family driving a Navigator while towing a less expensive car is suspicious. It notes Deputy Young's explanation that his training led him to believe that the 1998 Navigator might have been a "bargaining chip" for a drug-courier job. Before completion of the initial traffic stop at 2:07 p.m., however, the only information that Deputy Young had about the economic status of Urrieta and his passengers was his observation that Urrieta's girlfriend was wearing a waitress uniform, that all of the passengers were likely of Hispanic origin, and that Urrieta was a Mexican citizen. This information falls far short of establishing a reasonable suspicion that Urrieta was a drug courier. Urrieta provided evidence that the 1998 Navigator was nearly eight years old and worth approximately $12,500 at the time of the traffic stop in August of 2006. There is no reason why two working-class Mexican citizens could not afford such a vehicle. Likewise, there is nothing inherently suspicious about driving a newer vehicle on a cross-country trip while towing an older car.

Finally, the government argues that although the above profile-related factors may not in and of themselves have supported Urrieta's continued detention, they provided Deputy Young with a reasonable suspicion to detain Urrieta for further questioning when considered in the context of Urrieta's dishonesty about his immigration status. At the heart of the government's argument is the assertion that Urrieta might have been engaged in drug running because he lied to Deputy Young about his legal status in the country. Or, as the district court put it, Urrieta's "general dishonesty" about his immigration status provided Deputy Young with a reasonable suspicion that "something else" illegal was going on in Urrieta's car.

In 2006, however, as many as 12 million people in the United States lacked legal immigration status, 6.2 million of whom were from Mexico. *See* Pew Hispanic Center, The Size and Characteristics of the Unauthorized Migrant Population in the U.S., at 2 (March 7, 2006), *available at* http://pewhispanic.org/files/reports/61.pdf. Although false or evasive statements to a law enforcement officer might indicate criminal activity, *see United States v. $67,220 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992), the fact is that very few undocumented immigrants are likely to admit to law enforcement that they are in the country illegally. The government's reasoning that dishonesty about one's immigration status suggests drug running, therefore, opens the door to allowing millions of undocumented immigrants to be detained for further questioning on that basis. To hold that one's illegal presence in this county is a sign of anything more than an immigration violation stretches the Fourth Amendment much too far.

Deputy Young's testimony at the suppression hearing provides further confirmation that he was relying on an impermissible, ill-defined hunch that Urrieta, as a presumptively undocumented immigrant from Mexico, was likely to be transporting drugs. The Fourth Amendment prohibits detention based on an "inchoate and unparticularized suspicion or 'hunch,'" and instead requires law enforcement to provide "specific and articulable facts" showing that a crime has occurred. *Terry v. Ohio*, 392 U.S. 1, 21, 27, 30 (1968). Yet Deputy Young explained at the suppression hearing that he knew that Urrieta was "up to something" illegal in the same way as "when I walk in the house and I look at my little boy, I know whether he has done something wrong." The district court dismissed the officer's statement as irrelevant to the reasonable-suspicion calculation. To the contrary, however, we find Deputy Young's statement to be quite revealing as the very definition of a "hunch," which strongly suggests that he lacked a reasonable suspicion that Urrieta was a drug courier. *See id.* at 27. The Fourth Amendment simply does not allow a detention based on an officer's 'gut feeling' that a suspect is up to no good. *See id.* at 21, 27, 30.

The government also implies that detaining Urrieta after 2:07 p.m. was justified because the extended detention was reasonably brief. We respectfully disagree. Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity. *See United States v. Townsend*, 305 F.3d 537, 541, 545 (6th Cir. 2002) (holding that to detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct). In other words, law enforcement does not get a free pass to extend a lawful detention into an unlawful one simply because the unlawful extension was brief.

Chief Justice Earl Warren once wrote that the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21, n.18. The factors relied on in the present case are simply too vague and nonspecific to support a reasonable suspicion of drug running. For that reason, we cannot uphold the district court's highly nonspecific finding that the extended detention was justified because "something else" illegal might have been going on in Urrieta's car. Although we do not relish the consequence of allowing a person possessing prohibited items to go free, we find even more unpalatable the thought of putting our stamp of approval on the practice of unlawfully extending the detention of traffic violators based on nothing more than an inchoate hunch.

### III.  CONCLUSION

Because we conclude that the extended detention violated Urrieta's Fourth Amendment rights, we have no need to address the district court's finding that Urrieta's later consent to the search was voluntary.  The judgment of the district court is **REVERSED**, and all evidence acquired after 2:07 p.m. must be suppressed as the "fruit[] of the poisonous tree." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).  This case is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

**DISSENT**

---

McKEAGUE, Circuit Judge, dissenting.  Because I disagree with the majority's conclusion that the brief detention at issue here violated Urrieta's Fourth Amendment rights, I respectfully dissent.

## A.          Reasonable Suspicion To Detain

The analytical framework for assessing an investigative detention under *Terry v. Ohio*, 392 U.S. 1 (1968), is a two-part analysis of the reasonableness of the stop.  *See United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006).  The first question is "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion."  *Id.*  If the detention is proper, the second question is "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  *Id.*   This court has explained that:

> Although the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination. Accordingly, "due weight" should be given to the inferences drawn from the facts by "resident judges."

*United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996)).

### 1.          Specific and articulable facts for reasonable suspicion

Despite the majority's suggestion to the contrary, the facts in the present case that support reasonable suspicion existed here included the following facts that were known to Deputy Young when he finished the call at 2:04 p.m. with EPIC: (1) the vehicles (both the Navigator and the Honda it pulled) were "fully" packed with belongings; (2) the defendant did not seem to care about the way the Honda was being towed (e.g., he utilized a homemade towbar); (3) the Navigator had a six-month old registration; (4) there was a disparity in value between the Navigator and the Honda, and the Navigator was a relatively expensive vehicle; (5) the defendant was unable to find his passport and he looked for the passport in the car he was towing instead of the car he was driving; (6) the passengers were nervous; (7) defendant was traveling from a drug source state to a drug distribution state (i.e., California to Atlanta); (8) the intended duration of the trip was relatively quick; and (9) the results of the EPIC check suggested defendant was lying about having a passport, being in the country legally, and the validity of his Mexican driver's license.

Considering these facts under the "totality of circumstances" test, Deputy Young had reasonable suspicion for the brief detention.  *See United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (holding reasonable suspicion existed based on a combination of six factors).  Which is to say, while any one of these facts may not amount to reasonable suspicion on its own, taken together they do.  More importantly, "[a] totality of the circumstances analysis prohibits us from discounting certain factors merely because, separately, they could potentially have 'an innocent explanation.'"  *Id.* at 614 (quoting *United States v. Arvizu,* 534 U.S. 266, 267 (2002)).  Moreover, irrespective of whether Deputy Young's "mistaken understanding of the law was the true reason" that he detained Urrieta, reasonable suspicion existed to detain him in any event.  *See Whren v.*

*United States*, 517 U.S. 806, 813 (1996) ("foreclos[ing] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").

Urrieta largely ignores Deputy Young's reliance on Urrieta's dishonesty as support for reasonable suspicion. Yet, the results of the EPIC check suggested that Urrieta was specifically lying about having a passport, being in the country legally, and the validity of his Mexican driver's license. An officer's awareness that the defendant is lying or being dishonest should raise an officer's suspicion. *See United States v. Atchley*, 474 F.3d 840, 848-49 (6th Cir. 2007) (finding lying and nervous demeanor combined with an informant's tip were enough to justify reasonable suspicion). To suggest otherwise, is to ask a police officer to turn a blind eye to what he or she learns during the traffic stop. *Cf. United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) ("To have simply sent Erwin on his way, without brief further questioning at the very least, would have been plainly unreasonable, even inept, police work.").

While I acknowledge Deputy Young had no authority to arrest Urrieta and Montes for an immigration violation because neither of them had reentered the country illegally, the EPIC call nonetheless indicated that Urrieta lied to Deputy Young. Therefore, I believe Deputy Young was entitled to explore those untruths by asking Urrieta some additional questions.

Almost immediately upon questioning, Urrieta gave answers that appropriately increased Deputy Young's suspicions. First, Urrieta became evasive about when he came into the country, changing the subject upon Deputy Young's question. Second, he began to change his story about his travel plans and eventually explained instead of Atlanta that he was going to West Palm Beach, Florida. Third, despite telling Deputy Young that he had dated his girlfriend for two to three years and was traveling a great distance with her, he was unable to confirm whether she had a passport or if she was in the country legally. This inconsistency led Deputy Young to suspect that they might not have known each other and were placed together for the sole purpose of transporting drugs. Fourth, upon being asked about his arrest record, Urrieta admitted to being arrested for not having his identification and yet, he was unable to find his passport during this stop. Fifth, Urrieta explained that he did not have steady work and that his girlfriend worked at Wendy's which increased Deputy Young's suspicions that it would be difficult for such a couple to afford a Navigator (even if used) and finance such a long distance trip. Sixth, Urrieta continued to change his story as to whether he had a visa or a passport. Last, Urrieta appeared to stall when Deputy Young asked whether there were ever drugs in the vehicles, eventually answering "I don't think so." J.A. 198.

Some latitude to explore Urrieta's lies to Deputy Young is particularly appropriate here because there existed other indicia (albeit not overwhelming) of drug activity. Indeed, that the defendant had a Mexican driver's license and that the Navigator's registration was expired were part of the totality of circumstances that established reasonable suspicion here. Both indicated that the defendant's "story" about the cars and his status in the country were untrue. It was the implausibility of the defendant's story about the registration and the defendant's lies about his status in the country that, in part, led Deputy Young to believe that criminal activity might be afoot. In particular, Deputy Young had specialized knowledge that drug dealers often hire illegal aliens to engage in illegal activities (e.g., transporting drugs) and provide them a car as a bargaining chip.

Deputy Young's observations that the vehicles were "fully packed" and that the defendant was towing another vehicle also contributed to Deputy Young's reasonable suspicion, even if, as defendant argues, these facts were consistent with a family moving. The Supreme Court squarely rejected an analogous argument from a respondent that "the facts suggested a family in a minivan on a holiday outing." *Arvizu*, 534 U.S. at 277. The Supreme Court found that "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."

*Id.* It further explained that while "each of these factors alone is susceptible of innocent explanation" taken together they suffice. *Id.* Moreover, given Deputy Young's specialized knowledge about drug couriers it was equally plausible, if not more likely, that the "move" was a cover story such that the packing of the cars was a part of the story or a way to shield illegal items. *See Ellis*, 497 F.3d at 613 ("The totality of the circumstances analysis permits police officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (citation and quotation marks omitted)).

While it is true that Deputy Young's observations that Urrieta was traveling from a drug source state to a distribution state and that the passengers were nervous are not facts that carry a lot of weight, they do nonetheless bolster reasonable suspicion in combination with the other factors. *See United States v. Sokolow*, 490 U.S. 1, 10 (1989) ("A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent."). It is worth noting that Deputy Young specifically mentioned that the relatively quick duration of the trip also raised his level of suspicion.

Deputy Young's observation regarding the disparity in value between the Navigator and the Honda are more indicative of criminal wrongdoing. Moreover, this fact should be given additional weight in light of his specialized knowledge that vehicles are used as bargaining chips for drug-courier jobs.

Urrieta's emphasis on one isolated aspect of Deputy Young's testimony regarding his general description of how he knew that Urrieta was engaged in illegal activities is a classic red herring. *See* J.A. 89 (Deputy Young explained he knew that Urrieta was involved in something illegal in the same way "when I walk in the house and I look at my little boy, I know whether he has done something wrong"). The context of Deputy Young's statement makes clear that defendant's reliance on this statement as a means to refute that reasonable suspicion existed is meritless. Deputy Young made the isolated statement at the end of an answer to a question posed on cross-examination. Earlier in that same answer Deputy Young provided specific facts that supported his suspicion, he also previously had explained those facts in his direct testimony, and later he reiterated those facts on re-direct. Indeed, the isolated statement was Deputy Young's attempt to draw an analogy for defense counsel, *not* the reason for his suspicion. Yet, I acknowledge that had that observation been the sum total of the basis for Deputy Young's suspicions then Urrieta's point would be well taken. On the present record, however, it is clear that specific and articulable facts supported Deputy Young's reasonable suspicion, as discussed *supra.* Accordingly, his isolated and general statement is of no consequence to the determination that reasonable suspicion existed here. *Cf. United States v. Wagner*, 193 F. App'x 463, 466 (6th Cir. 2006) ("The test for reasonable suspicion is not whether the detaining officer subjectively believes that the circumstances create a reasonable suspicion, but whether there is 'a particularized and objective basis for suspecting legal wrongdoing.'" (citing *Arvizu*, 534 U.S. at 273)).

## 2.    Reasonably related in scope

Because I would find that reasonable suspicion existed, I briefly will address the second part of the analysis, namely, "whether the stop was 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Perez,* 440 F.3d 363, 372 (6th Cir. 2006) (citing *Terry*, 392 U.S. at 20). This court has explained that:

[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The investigative means used should also be the least intrusive means reasonably

> available to verify or dispel the officer's suspicions in a short period of time. *Id.* The Supreme Court has rejected a rigid time limitation on the lawfulness of a *Terry* stop, and "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685, (1985). To assess whether a detention was too long to be justified as an investigative stop, courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686.

*Id.* (alteration in original).

Here, the short amount of time the officer detained Urrieta was justified. In total, from the time the officer finished his call with EPIC at 2:04 p.m. until the defendant gave his consent to search the vehicles verbally at 2:13 p.m., only 9 minutes later, or at most, in writing at 2:15 p.m. when only 11 minutes had passed. Moreover, both parties agree that the relevant time in question is actually somewhat less, from 2:07 p.m. when Deputy Young should have been able to return to Urrieta after the EPIC call and issue the citation until 2:13 p.m., amounting to only 6 minutes of detention when Urrieta gave his verbal consent, or at most, 2:15 p.m., a mere 8 minutes of detention when he gave his written consent.

What is more, approximately 3 minutes after the call finished with EPIC, and almost immediately upon Deputy Young's re-questioning of Urrieta, his answers bolstered Deputy Young's grounds for reasonable suspicion and provided support for the additional brief detention. Therefore, the defendant was detained for only 3 minutes when the officer had additional information that supported reasonable suspicion. Furthermore, the officer appeared otherwise diligent in pursuing his investigation. Indeed, the defendant does not raise any suggestion to the contrary in that respect.

While it might seem odd that Deputy Young had a drug dog in his patrol car that he did not use during the stop, Urrieta failed to raise this issue to the district court and similarly fails to raise it on appeal to this court. Moreover, at the suppression hearing, defense counsel asked Deputy Young about having the drug dog in the patrol car, *see* J.A. 87-88, but did not inquire about *why* Deputy Young did not use the dog during the stop. On such an undeveloped record, it is not this court's role to speculate about why Deputy Young did not use the dog and therefore I disagree with the majority's conclusion that it "strongly suggests that he did not have a reasonable suspicion that Urrieta was transporting drugs."

Accordingly, both because the time frame was relatively short and the officer was proceeding diligently, I would find that the detention of the defendant did not impermissibly expand the scope of the *Terry* stop.

## B.      Voluntary Consent

Because I would find reasonable suspicion existed to detain Urrieta, I briefly will address the district court's finding that Urrieta's consent to search the vehicle was voluntary.

The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Accordingly, "the district court's decision regarding consent will not be overturned unless it is clearly erroneous." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (citation omitted).

To determine if consent was voluntary, a district court must look at the totality of the circumstances and examine the following factors: "the age, intelligence, and education of the

individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (citation omitted).

Urrieta argues that, in permitting the search, he was acquiescing to Deputy Young's authority rather than giving voluntary consent. To the contrary, the district court found that Urrieta's consent was voluntary. I agree.

Indeed, there is no basis to conclude that the district court erred in determining that Urrieta was of the proper age, education, and intelligence to understand his rights. Nor is there any evidence that Urrieta failed to understand Deputy Young's questions or the nature of his request to search the two vehicles. When Deputy Young asked Urrieta if he could search his car, Urrieta responded "sure." J.A. 199. Deputy Young then explained to Urrieta that he was seeking Urrieta's permission to look for illegal items. He also provided Urrieta with a written consent form translated into Spanish. Deputy Young proceeded to leave Urrieta alone to read and sign the form. Although Urrieta originally gave consent for Deputy Young to search only the Honda, Urrieta did not object in any way when Deputy Young told him that he also wanted to search the Navigator.

There is also no evidence that Deputy Young ever threatened Urrieta or attempted to coerce him into giving his consent to the search. To the contrary, a review of the traffic stop video reveals that Deputy Young was polite and courteous to Urrieta and his passengers during the entire stop. Accordingly, I would find that the district court's conclusion that Urrieta's consent was voluntary was not clearly erroneous.

For all of the aforementioned reasons and those discussed in the well-reasoned district court opinion, *see United States v. Urrieta*, No. 3:06-00154, 2007 WL 208526, *1 (M.D. Tenn. Jan. 24, 2007), given the totality of the circumstances, I would find that reasonable suspicion existed to detain the defendant for the brief period after the results of the EPIC call and before the voluntary consent to search the vehicles and therefore the defendant's Fourth Amendment rights were not violated. *See, e.g., Ellis*, 497 F.3d at 614 ("While a prolonged detention may not have been justified, we conclude that, under these circumstances, the additional detention of eight minutes and twenty-one seconds for further investigation of Trooper Topp's reasonable suspicions was lawful and not a violation of defendant's Fourth Amendment right to be protected 'against *unreasonable* searches and seizures.'" (quoting U.S. Const. amend. IV (emphasis added))); *United States v. Walton*, No. 06-5297, 2007 WL 4395577, *6 (6th Cir. 2007) (finding "that reasonable suspicion existed to detain defendant during the brief time period after defendant's license and registration 'had come up clear'" and therefore the defendant's Fourth Amendment rights were not violated). Accordingly, I respectfully dissent.