NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0462n.06

No. 12-5323

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*May 09, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| RONTEZ P. COLBERT, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| *Defendant-Appellant*. | ) | **O P I N I O N** |

BEFORE:    COLE and GRIFFIN, Circuit Judges; GWIN, District Judge.[*]

COLE, Circuit Judge.   Defendant-Appellant Rontez Colbert appeals his conviction and

sentence for possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and

924(e)(1).  Colbert argues that the district court erred in:  (1) denying his motion to suppress certain

evidence seized during the search of his vehicle; and (2) sentencing him as an armed career criminal

under 18 U.S.C. § 924(e).  Because we conclude that the district court did not err as to either of

Colbert's claims, we AFFIRM.

I.

On October 25, 2010, Louisville Metro Police Department officers and Shannon Wamsley,

an ATF agent, surveilled Victory Park in Louisville, Kentucky.  Detective Ryan Nichols, a member

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of
Ohio, sitting by designation.

of the Louisville Metro street-level narcotics unit, supervised the surveillance. Nichols frequently surveilled Victory Park because the area is rife with drug trafficking, violent crime, and gang activity. Nichols characterized the area as an "open-air drug market."

The officers first observed Rontez Colbert at Victory Park at approximately 5:00 p.m. Colbert approached individuals and vehicles in the park, and then quickly returned each time to his vehicle or a picnic table after a short interaction. The officers watched Colbert approach ten to fifteen individuals over the course of approximately thirty minutes. In the officers' experience, Colbert's behavior was consistent with hand-to-hand drug sales, though they were unable to observe whether Colbert actually exchanged drugs for money.

At approximately 5:30 p.m., the officers followed a station wagon driven by Colbert to a residence at 2109 Dumesnil (the "Dumesnil Residence"), a few blocks from Victory Park. They watched Colbert enter the house and exit five to ten minutes later. The officers did not see Colbert carry anything from the house, but their experience led them to believe Colbert was using the Dumesnil Residence to store drugs. Colbert then drove back to Victory Park.

Once he had returned to the park, Colbert again engaged in what the police believed were hand-to-hand drug transactions with an additional ten to fifteen individuals. As before, the officers observed Colbert, but did not intervene in any way. Colbert again drove to the Dumesnil Residence, stayed there for five to ten minutes, and then drove back to Victory Park. Colbert repeated this pattern a third time.

Nichols pulled Colbert over at approximately 6:30 p.m. for failing to use his turn signal. Once stopped, Colbert attempted to exit the vehicle, but Nichols and Detective Mickey King ordered

him to remain seated. Nichols then asked Colbert "if he had anything on him, anything in the vehicle." Colbert responded that he did not.

Detective Ed Louden called for a K-9 unit with a drug-detection dog. Nichols then allowed Colbert to exit his car and proceeded to pat him down. Nichols found neither weapons nor contraband, and an identification check through the police database did not reveal any outstanding warrants. Nichols then asked Colbert for permission to search his vehicle, but Colbert refused.

Nichols continued to question Colbert until the K-9 unit arrived, approximately ten to fifteen minutes later. As Colbert watched from the steps of a nearby store, the K-9 officer walked the dog around Colbert's vehicle. The dog did not alert to the presence of drugs. Nichols conferred briefly with the K-9 officer and then reapproached Colbert. Nichols recalled the subsequent exchange with Colbert:

> "Are you sure there's nothing in your vehicle? You just saw the K-9 drug dog run around your car. Do you have anything in your vehicle that you need to tell me about?" [Colbert then] replied that there was a marijuana blunt in the backseat . . . .

Nichols's questions and Colbert's response occurred immediately after the dog failed to indicate that there were any drugs in Colbert's vehicle. It is undisputed that Nichols did not tell Colbert that the dog failed to alert to drugs.

Believing that Colbert's admission that marijuana was in the car gave him probable cause, Nichols searched the vehicle and found a baggie of marijuana on the back seat. Nichols then asked the K-9 officer to have the dog search inside the vehicle. During the search, the dog signaled the presence of drugs in the pocket of a jacket in the open cargo compartment of the vehicle. When the

K-9 officer leaned into the vehicle, he noticed a handgun underneath the jacket. The officers seized the handgun. Sometime between 7:15 p.m. and 7:30 p.m., the officers arrested Colbert.

At the police station, ATF agents Justin Demaree and Kevin Funke interviewed Colbert. Colbert acknowledged that he owned the firearm. Based on Colbert's statements and evidence obtained during the traffic stop, the officers secured and executed a search warrant for the Dumesnil Residence.

On October 26, 2010, the government charged Colbert with violating 18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm. Colbert moved to suppress his statement that there was marijuana in his vehicle, and the seizure of the marijuana and the firearm In the same motion, Colbert also moved for a *Franks* hearing.

On April 21, 2011, the district court held a hearing on Colbert's motion. It thereafter denied the motion in its entirety. First, the district court concluded that the officers had probable cause to stop Colbert because they observed Colbert fail to use his turn signal. Second, the district court found that the officers' detention of Colbert for ten to fifteen minutes until the K-9 unit arrived was lawful because the officers reasonably suspected that Colbert had drugs inside his vehicle. Finally, the district court determined that Nichols's additional questioning of Colbert—immediately after the dog failed to alert—was lawful because the prolongation of the stop was *de minimis* and reasonable. For these reasons, the district court concluded that the search of Colbert's vehicle did not violate the Fourth Amendment, and it denied Colbert's request for a *Franks* hearing.

On September 28, 2011, a jury convicted Colbert of possession of a firearm by a convicted felon. During his sentencing, Colbert objected to his designation as an armed career criminal,

contending that his 2003 Kentucky conviction for assault under extreme emotional disturbance was not a "violent felony" within the meaning of § 924(e). The district court overruled Colbert's objections and sentenced him to 235 months in prison. This appeal followed.

II.

Colbert presents two arguments on appeal. First, he argues that the district court erred by denying his motion to suppress. Second, he asserts that the district court erred by sentencing him as an armed career criminal under 18 U.S.C. § 924(e). We address each issue in turn.

*A. Motion to Suppress*

"We review the district court's denial of [the defendant's] motion to suppress under a mixed standard of review." *United States v. Davis*, 430 F.3d 345, 351 (6th Cir. 2005). "We reverse the district court's findings of fact only if they are clearly erroneous, but review *de novo* the district court's legal conclusions." *United States v. Akridge*, 346 F.3d 618, 622 (6th Cir. 2003). "Where, as here, the district court has denied [the defendant's] motion to suppress, we review the evidence in a light most favorable to the [g]overnment." *Id.* at 622-23.

"Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (internal quotation marks omitted). "We review the reasonableness of police conduct in effectuating a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). A traffic stop is valid under *Terry* only if it is "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983). A stop is limited in scope if the "investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officer's

suspicion in a short period of time." *Id.* A stop is limited in duration if it is "temporary and last[s] no longer than is necessary to effectuate the purpose of the stop." *Id.* In considering the duration of the stop, we must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Colbert challenges the scope and duration of his detention after the initial traffic stop for failure to use a turn signal had concluded. We have repeatedly held that to detain a suspect after an initial traffic stop has concluded, the officer must have reasonable suspicion of additional criminal activity. *See, e.g.*, *Stepp*, 680 F.3d at 661-62; *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008); *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). When a stop is prolonged, we ask whether the "totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole . . . was reasonable." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (internal quotation marks and citation omitted).

Colbert argues that the police lacked reasonable suspicion to expand the scope and duration of the traffic stop to investigate him for drug possession. Further, Colbert argues that even if the police had reasonable suspicion of drug possession, such reasonable suspicion was dispelled when the dog failed to alert positively to the presence of drugs in the vehicle. The government responds that the police had reasonable suspicion of drug possession from observing the transactions in which Colbert participated, and the failure of the dog to alert did not negate this reasonable suspicion.

The facts of this case bear some similarity to those in *Davis*. In *Davis*, officers suspected that Davis was involved in drug activity based on three observations: (1) a cocaine supplier met, at

different times, with three different people, and officers found cocaine on each of these three people immediately after the three meetings; (2) the cocaine supplier talked face-to-face with Davis; and (3) there were detergent boxes close to Davis's car. *Davis*, 430 F.3d at 349. An officer pulled Davis over for speeding, and officers brought a drug-detection dog to the scene. *Id.* at 349-50. We found that the officers had the reasonable suspicion necessary to prolong the stop to locate and procure the dog. *Id.* at 355. After the dog failed to alert, the officers on the scene detained Davis for an additional hour, until a second dog was brought to the scene. *Id.* at 350. We held that the officers' suspicions in *Davis* were dispelled when the first dog failed to alert and that the officers' prolonged detention of Davis after the first dog failed to alert violated the Fourth Amendment. *Id.* at 356-57.

Like in *Davis*, we conclude that the officers here had reasonable suspicion that Colbert possessed drugs to support detaining him after the initial traffic stop had concluded. In *Davis*, the officers suspected Davis primarily because of the actions of a person with whom he associated, a known cocaine supplier. They inferred that because Davis was meeting with the cocaine supplier, Davis must also have been engaged in drug activity. Here, on the other hand, Nichols suspected Colbert because of Colbert's *own* actions. Nichols inferred that because Colbert appeared to be engaging repeatedly in the hand-to-hand transactions characteristic of drug trafficking in a park known for its drug activity, there was a reasonable likelihood that Colbert had been engaging in drug trafficking. The failure of the drug-detection dog to alert initially to drugs in Colbert's vehicle did not dispel that suspicion.

Additionally, unlike in *Davis*, there was virtually no delay between the dog's failure to alert, Nichols's questions, and Colbert's immediate admission to the presence of drugs in the vehicle.

Under these circumstances, "the duration of the stop as a whole . . . was reasonable." *Everett*, 601

F.3d 484 (internal quotation marks and citation omitted).

*B. Sentencing Under the Armed Career Criminal Act*

Colbert argues that the district court erred when it sentenced him as an armed career criminal

because his Kentucky conviction for assault under extreme emotional disturbance does not qualify

as a "violent felony" under the ACCA. We disagree. Put simply, extreme emotional disturbance

does not negate the intent elements of first or second degree assault under Kentucky law.

The ACCA mandates a fifteen-year-minimum sentence for a defendant convicted under 18

U.S.C. § 922(g), when that defendant has three or more prior convictions for a "violent felony" or

"serious drug offense." 18 U.S.C. § 924(e)(1). The ACCA defines "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year, . . . that—
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

*Id.* § 924(e)(2)(B).

We review de novo the district court's determination that an offense constitutes a "violent

felony" under the ACCA. *United States v. Gross*, 624 F.3d 309, 322 (6th Cir. 2010) (citing *United

States v. Hargrove*, 416 F.3d 486, 494 (6th Cir. 2005)). "[I]n determining the nature of a defendant's

prior conviction, we apply a 'categorical' approach, meaning that we look at the statutory definition

of the crime of conviction, not the facts underlying that conviction, to determine the nature of the

crime." *United States v. Ford*, 560 F.3d 420, 421-22 (6th Cir. 2009); *see also Taylor v. United States*, 495 U.S. 575, 602 (1990).

Colbert's PSR identified the following offenses as qualifying predicate felonies under the ACCA: (1) second degree assault; (2) first degree trafficking in a controlled substance, cocaine; and (3) felony assault under extreme emotional disturbance. Colbert challenges only the district court's determination that his conviction for assault under extreme emotional disturbance is a "violent felony" under the ACCA.

We first analyze Colbert's conviction for felony assault under extreme emotional disturbance to determine if it is categorically violent based on the statutory definition of the crime. *See United States v. Gibbs*, 626 F.3d 344, 352 (6th Cir. 2010). At the time of his 2003 conviction, the statute provided:

> In any prosecution under KRS 508.010, 508.020 or 508.030 in which intentionally causing physical injury or serious physical injury is an element of the offense, the defendant may establish in mitigation that he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020.

Ky. Rev. Stat. Ann. § 508.040 (2003). Colbert says that § 508.040 does not define "a particular mental state for assault under extreme emotional disturbance," and thus the offense is not a violent felony under the ACCA. But Colbert ignores the plain language of § 508.040, which is applicable only in "prosecution[s] under KRS 508.010 [first degree assault], 508.020 [second degree assault]

or 508.030 [fourth degree assault]." Thus, § 508.040 incorporates the elements of either § 508.010, § 508.020, or § 508.030.[1]

Under Kentucky law at the time of Colbert's conviction, first and second degree assault were violent felonies under the ACCA because they penalized *intentionally* causing serious physical injury and *intentionally* causing physical injury, respectively. *See United States v. Anderson*, 695 F.3d 390, 400 (6th Cir. 2012). In *Anderson*, we held that an Ohio aggravated assault statute that "require[d] proof of 'serious physical harm' or 'physical harm'" had as "an element the use, attempted use, or threatened use of physical force against the person of another," and thus was a "violent felony" under the ACCA. *Id.* (quoting Ohio Rev. Code § 2903.12(A)(1)-(2)). Colbert's PSR does not indicate whether the underlying basis for his conviction for assault under extreme emotional disturbance was § 508.010 or § 508.020.[2] Nevertheless, both § 508.010 and § 508.020 required proof of serious physical injury or physical injury, and thus had "'as an element the use, attempted use, or threatened use of physical force against the person of another.'" *Anderson*, 695 F.3d at 400 (quoting 18 U.S.C. § 924(e)(2)(B)(i)).

Colbert also argues that a conviction under § 508.040 is possible only if a judge or jury excuses "the intentionally causing injury or serious physical injury" element of the offense. But again, Colbert ignores the plain language of § 508.040, which limits the application of assault under

---

[1]Fourth degree assault, § 508.030, is a Class B misdemeanor. *See* Ky. Rev. Stat. Ann. § 508.040(2)(b). Thus, it is not relevant to Colbert's appeal because the Jefferson Circuit Court found Colbert guilty of felony assault under extreme emotional disturbance.

[2]It does, however, say that Count 1 of Colbert's indictment was amended from "Assault 1st Degree."

extreme emotional disturbance to prosecutions under § 508.010, § 508.020, or § 508.030 "in which *intentionally* causing physical injury or serious physical injury *is an element* of the offense." Ky. Rev. Stat. Ann. § 508.040 (2003) (emphasis added). Further, the commentary to § 508.040 says "[t]he purpose of this statute is to provide the same type of mitigating, degree-reducing factor in the law of assault as exists in the law of homicide. It affects only *intentionally-caused assaults* and then only to the *extent of reducing the sanctions*." *Id.* § 508.040 cmt. (1974) (emphasis added). Thus, contrary to Colbert's assertion that § 508.040 operates to excuse the intentional nature of the act, § 508.040 operates only to reduce the applicable sentence.

Finally, Colbert contends that the district court did not analyze the elements of his conviction to determine whether it had as an element the use, attempted use, or threatened use of physical force. But Colbert cites to no authority to support his argument, nor does he develop this argument further. Colbert did not respond to *any* of the Government's arguments about his sentencing in his reply brief. Thus, Colbert has waived this issue. *See In re Mitan*, 573 F.3d 237, 248 n.5 (6th Cir. 2009) ("The creditors provide no citation to authority or argument to support their last-sentence request. The creditors consequently have waived the issue.") (citing *Grinter v. Knight*, 532 F.3d 567, 574 n.4 (6th Cir. 2008)); *United States v. Robson*, 307 F. App'x 907, 912 (6th Cir. 2009). Consequently, the district court did not err when it determined that Colbert's conviction for assault under extreme emotional disturbance was a violent felony under the ACCA.

III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

JAMES S. GWIN, District Judge, concurring.

While I join in the disposition of this case, I write separately to emphasize that I do so because Detective Nichols delayed Colbert for only a *few seconds* after the drug dog failed to alert and because Nichols had *strong reasonable suspicion* based on his surveillance of Colbert.

I am troubled by the events of this case. After the drug dog failed to alert, Nichols's interaction with Colbert was short: a single question about drugs. Likely, the interaction was short only because Colbert gave Nichols the answer he wanted: there was marijuana in the car.

Colbert complied during the traffic stop and Nichols had his chance to investigate. Nichols questioned Colbert about drugs, patted him down, and ran a database check on Colbert's identification. Nichols's investigation failed to produce any additional evidence to confirm his suspicions, but Nichols detained Colbert until a drug dog could arrive. After the dog arrived, the officers took him around Colbert's vehicle. The dog failed to alert. Yet, despite the failure of all of Nichols's investigative techniques, he once again went back to question Colbert about drugs. And finally, this time, Nichols got the answer he wanted.

When does an officer's failure to confirm their suspicions transform a *Terry* stop into an unconstitutional seizure? The Supreme Court has said that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). In other circumstances, if the delay is longer or the suspicion is weaker, I believe the detention becomes unreasonable. But here, Nichols delayed Colbert for only a few seconds after the drug dog failed to alert, and he had reasonable suspicion based on his surveillance of Colbert. For this reason, I join in the disposition of this case.