BEA, Circuit Judge,
concurring in part and dissenting in part:
I quite agree with the majority that “[t]he purpose of Congress is the ultimate touchstone” in determining whether Arizona’s S.B. 1070 is preempted under the Supremacy Clause. Retail Clerks v. Schermerhom, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Thus, this court is tasked with determining whether Congress intended to fence off the states from any involvement in the enforcement of federal immigration law. It is Congress’s intent we must value and apply, not the intent of the Executive Department, the Department of Justice, or the United States Immigration and Customs Enforcement. Moreover, it is the enforcement of immigration laws that this case is about, not whether a state can decree who can come into the country, what an alien may do while here, or how long an alien can stay in this country.
By its very enactment of statutes, Congress has provided important roles for state and local officials to play in the enforcement of federal immigration law. First, the states úbe free, even without an explicit agreement with the *370 federal government, “to communicate with the Attorney General regarding the immigration status of any individual.” 8 U.S.C. § 1357(g)(10)(A). Second, to emphasize the importance of a state’s involvement in determining the immigration status of an individual, Congress has commanded that federal authorities “shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual.” Id. § 1373(c) (emphasis added). Third, putting to one side communications from and responses to a state regarding an individual’s immigration status, no agreement with the federal government is necessary for states “otherwise [than through communications regarding an individual’s immigration status] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.” Id. § 1357(g)(10)(B). Finally, Congress has even provided that state officers are authorized to arrest and detain certain illegal aliens. Id. § 1252c. Recognizing the important role of states in enforcing immigration law, the record shows that the federal government has welcomed efforts by New Jersey[1] and Rhode Island,[2] efforts which Arizona attempts to mirror with S.B. 1070. The record is bereft of any evidence that New Jersey’s or Rhode Island’s efforts have in any way interfered with .federal immigration enforcement. To the contrary, the federal government embraced such programs and increased the number of removal officers to handle the increased workload.
Nonetheless, the United States has here challenged Arizona S.B. 1070 before it went into effect and, thus, made a facial challenge to the legislation. “A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). As the Supreme Court stated:
In determining whether a law is facially invalid, we must be careful not to go beyond the statute’s facial requirements and speculate about “hypothetical” or “imaginary” cases.... Exercising judicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.
It is urged that all law enforcement officials, including state and local law enforcement agencies take steps to support the enforcement of federal immigration laws by investigating and determining the immigration status of all non-citizens taken into custody, incarcerated, or under investigation for any crime and notifying federal authorities of all illegal immigrants discovered as a result of such investigations.
*371 Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). Further:
Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.
Id. at 450-51, 128 S.Ct. 1184 (internal quotation marks and citations omitted).[3]
Our task, then, is — or should be — to examine the Arizona legislation and relevant federal statutes to determine whether, under the United States’ facial challenge, S.B. 1070 has applications that do not conflict with Congress’s intent. I respectfully dissent from the majority opinion as to Sections 2(B) (entitled “Cooperation and assistance in enforcement of immigration laws; indemnification”) and 6 (entitled “Arrest by officer without warrant”), finding their reasoning as to Congress’s intent without support in the relevant statutes and case law. As to Sections 3 and 5(C), I concur in the result and the majority of the reasoning, although I dissent to the portion of the majority’s reasoning which allows complaining foreign countries to preempt a state law. I address S.B. 1070’s sections in numerical order, as the majority did.

I. Section 2(B)

I dissent from the majority’s determination that Section 2(B) of Arizona S.B. 1070[4] is preempted by federal law and *372 therefore is unconstitutional on its face. As I see it, Congress has clearly expressed its intention that state officials should assist federal officials in checking the immigration status of aliens, see 8 U.S.C. § 1373(c), and in the “identification, apprehension, detention, or removal of aliens not lawfully present in the United States,” 8 U.S.C. § 1357(g)(10)(B). The majority comes to a different conclusion by minimizing the importance of § 1373(c) and by interpreting § 1357(g)(10) precisely to invert its plain meaning “Nothing in this subsection shall be construed to require an agreement ... to communicate with the Attorney General regarding the immigration status of any individual” (emphasis added) to become “Everything in this subsection shall be construed to require an agreement.”[5] Further, the majority mischaracterizes the limited scope of Section 2(B), misinterprets the Supreme Court’s cases on foreign relations preemption to allow any complaining foreign country to preempt a state law, and holds that the prospect of all 50 states assisting the federal government in identifying illegal aliens is — to Congress — an unwanted burden. I discuss each one of these errors in turn below.
The district court found that Section 2(B) resulted in an unconstitutional invasion of the province of federal immigration law for a variety of reasons. But there seems little point to examine and rebut the district court’s findings, because the majority opinion does not adopt any of them.[6] *373 Rather, the majority opinion rests its ease solely on its inverted reading of § 1357(g), which prescribes the process by which Congress intended state officers to play a role in the enforcement of federal immigration laws.

A. 8 U.S.C. § 1373(c)

As noted above, Congress has clearly stated its intention to have state and local agents assist in the enforcement of federal immigration law, at least as to the identification of illegal aliens, in two federal code sections. First is 8 U.S.C. § 1373(c), which reads:
The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.
8 U.S.C. § 1373(c). The title of § 1373(c) is “Obligation to respond to inquiries.” Thus, § 1373(c) requires that United States Immigration and Customs Enforcement (“ICE”)[7] respond to an inquiry by any federal, state, or local agency seeking the immigration status of any person. The Report of the Senate Judiciary Committee accompanying the Senate Bill explained that the “acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.” S.Rep. No. 104-249, at 19-20 (1996) (emphasis added).
Section 1373(c) does not limit the number of inquiries that state officials can make, limit the circumstances under which a state official may inquire, nor allow federal officials to limit their responses to the state officials.[8] Indeed, as established by *374 the declaration of the United States’ own Unit Chief for the Law Enforcement Support Center (“LESC”), the LESC was established “to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis.” Section 1373(c) demonstrates Congress’s clear intent for state police officials to communicate with federal immigration officials in the first step of immigration enforcement — identification of illegal aliens.
The majority misstates my interpretation of § 1373(c)’s scope. Neither I, nor Arizona, claim § 1373(c) allows Arizona to pursue its “own immigration policy.” Maj. Op. at 351. Instead, § 1373(c) demonstrates Congress’s intent for Arizona to help enforce Congress’s immigration policy, but in a way with which the Executive cannot interfere. Congress has required that the federal government respond to state and local inquires into a person’s immigration status, 8 U.S.C. § 1373(c), which allows states to “cooperate with the Attorney General in the identification, apprehension, detention, or removal of [illegal] aliens,” id. § 1357(g)(10)(B).

B. 8 U.S.C. § 1857(g)

The second federal code section which states Congress’s intention to have state authorities assist in identifying illegal aliens is 8 U.S.C. § 1357(g), entitled “Performance of immigration officer functions by State officers and employees.” Subsections (g)(l)-(9) provide the precise conditions under which the Attorney General may “deputize” state police officers (creating, in the vernacular of the immigration field, “287(g) officers”) for immigration enforcement pursuant to an explicit written agreement. For example, § 1357(g)(1) defines the scope of any such agreement, § 1357(g)(3) provides that the Attorney General shall direct and supervise the deputized officers, § 1357(g)(6) prohibits the Attorney General from deputizing state officers if a federal employee would be displaced, and § 1357(g)(7)-(8) describe the state officers’ liability and immunity. Section 1357(g)(9) clarifies that no state or locality shall be required to enter into such an agreement with the Attorney General. Finally, § 1357(g)(10) explains what happens if no such agreement is entered into: it recognizes the validity of certain conduct by state and local officers, and explicitly excepts such conduct from a requirement there be a written agreement between the state and federal authorities:
Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State' — ■
(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or
(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.
8 U.S.C. § 1357(g)(10).
The majority’s error is to read § 1357(g)(l)-(9), which provides the precise *375 conditions under which the Attorney General may enter into written agreements to “deputize” officers, as the exclusive authority which Congress intended state officials to have in the field of immigration enforcement. That reading is made somewhat awkward in view of § 1357(g)(10), which explicitly carves out certain immigration activities by state and local officials as not requiring a written agreement. But, the majority opinion reasons that since state officials cannot themselves remove illegal aliens, the natural reading of § 1357(g)(10) is that state officials cannot act at all in immigration enforcement matters, absent an explicit written agreement, unless:
1. They are “called upon” by the Attorney General; OR
2. There is a “necessity”; AND
3. Such cooperation is “incidental,” rather than “systematic and routine.”
Maj. Op. at 349-50. I concede the majority’s insertion of the quoted terms into § 1357(g)(10) is quite original, which perhaps explains why no legal basis is cited for any of it. Neither does the majority opinion give us any clue from statute, regulations, or case authority as to the genesis of the key conditioning phrases “calls upon,” “necessity,” “routine,” or “systematic,” which^-in their opinion — would legitimate agreement-less state intervention. Needless to say, anyone who actually reads § 1357(g)(10) will observe that none of the quoted words appear in that statute, nor indeed in any part of the Immigration and Naturalization Act (“INA”).[9] 8 U.S.C. § 1101 et seq. Alas, the majority opinion does not point us where to look.[10]
*376 To determine Congress’s intent, we must attempt to read and interpret Congress’s statutes on similar topics together. Wachovia Bank v. Schmidt, 546 U.S. 303, 316, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006) (“[U]nder the in pari materia canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law.” (internal quotations omitted)). In light of this, I submit that a more natural reading of § 1357(g)(10), together with § 1373(c), leads to a conclusion that Congress’s intent was to provide an important role for state officers in the enforcement of immigration laws, especially as to the identification of illegal aliens.
Unless the state officers are subject to a written agreement described in § 1357(g)(l)-(9), which would otherwise control their actions, the state officers are independently authorized by Congressional statute “to communicate with the Attorney General regarding the immigration status of any individual.” 8 U.S.C. § 1357(g)(10)(A). Moreover, state officers are authorized “to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.” Id. § 1357(g)(10)(B) (emphasis added).[11] Of course, the majority is correct that state officers cannot themselves remove illegal aliens from the United States. The majority would read that inability as evidence of congressional intent that state officers cannot act at all with respect to other aspects of immigration enforcement that lead to removal, save on the orders of federal officers pursuant to the provisions of written agreements as set forth in 1357(g)(l)-(9). Maj. Op. at 349. Were that so, § 1357(g)(10) would be redundant and a dead letter, save for the vague and uncertain powers which the majority limits by its newly-crafted terms “calls upon,” “necessity,” “systematic” and “routine.” We must interpret statutes in a manner to give each part of the statute meaning, if at all reasonable. See, e.g., U.S. v. Lopez, 514 U.S. 549, 589, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (“An interpretation of [the Commerce Clause] that makes the rest of [Article I,] § 8 superfluous simply cannot be correct.”); see also Williams v. Thude, 188 Ariz. 257, 934 P.2d 1349, 1351 (1997) (“Each word, phrase, clause, and sentence [of a statute] must be given meaning so that no part will be void, inert, redundant, or trivial.” (internal quotation marks omitted, alteration and emphasis in original)).
Further, “the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is *377 within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms.” Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Section 1357(g)(10) need not be interpreted at all — its plain language states that “Nothing in this subsection [8 U.S.C. § 1357(g) ] shall be construed to require an agreement under this subsection in order for any officer ... to communicate with the Attorney General regarding the immigration status of any individual.” There is no need to place restrictions on this meaning, through terms such as “calls upon,” “necessity,” “systematic,” and “routine,” because the statute’s meaning is clear and includes no such limitations.
I agree with the majority that “we must determine how the many provisions of [the] vastly complex [INA] function together.” Maj. Op. at 351. However, the majority opinion’s interpretation of § 1357(g)(10), which requires the Attorney General to “call upon” state officers in the absence of “necessity” for state officers to have any immigration authority, makes § 1373(c) a dead letter. Congress would have little need to obligate federal authorities to respond to state immigration status requests if it is those very same federal officials who must call upon state officers to identify illegal aliens. Further, there is no authority for the majority’s assertion that § 1357(g) establishes the “boundaries” within which state cooperation pursuant to § 1373(c) must occur. Maj. Op. at 351. Indeed, “communications] with the Attorney General regarding the immigration status of any individual” were explicitly excluded from § 1357(g)’s requirement of an agreement with the Attorney General. 8 U.S.C. § 1357(g)(10)(A). Congress intended the free flow of immigration status information to continue despite the passage of § 1357(g), and so provided in subsection (g)(10). The majority’s interpretation turns § 1357(g)(10) and § 1373(c) into: “Don’t call us, we’ll call you,” when what Congress enacted was “When the state and local officers ask, give them the information.”
The majority’s attempt to straight-jacket local and state inquiries as to immigration status to what “terms” the “federal government” dictates reveals the fundamental divide in our views. The majority finds the intent of “the government” decisive; I look to Congress’s intent — as required by Supreme Court preemption law.
Further, to “cooperate” means, I submit, “to act or operate jointly, with another or others, to the same end; to work or labor with mutual efforts to promote the same object.” Webster’s New Twentieth Century Dictionary of the English Language Unabridged (Jean L. McKechnie ed., 1979). It does not mean that each person cooperating need be capable of doing all portions of the common task by himself. We often speak of a prosecution’s “cooperating witness,” but it doesn’t occur to anyone that the witness himself cannot be “cooperating” unless he is able to prosecute and convict the defendant himself. Hence, the inability of a state police officer to “remove” an alien from the United States does not imply the officer is unable to cooperate with the federal authorities to achieve the alien’s removal.
The provision of authority whereby the Attorney General may “deputize” state police officers allows the Attorney General to define the scope and duration of the state officers’ authority, as well as “direct[ ] and supervis[e]” the state officers in performing immigration functions. 8 U.S.C. § 1357(g)(l)-(9). However, this is merely one of two forms of state participation in federal immigration enforcement provided for by Congress in § 1357(g). Congress *378 provided for another form of state participation, for which no agreement is required — states are free “to communicate with the Attorney General regarding the immigration status of any individual,” id. § 1357(g)(10)(A), and are also free “otherwise [than by communication] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,” id. § 1357(g)(10)(B).
This conclusion is confirmed by a close comparison of the language in each part of § 1357(g). As to the authority of the Attorney General to enter explicit written agreements, these agreements are limited to deputizing state officers to perform immigration-related functions “in relation to the investigation, apprehension, or detention of aliens in the United States.” Id. § 1357(g)(1). Notably absent from this list of functions is the “identification” of illegal aliens. However, Congress recognized state officers’ authority even in the absence of a written agreement with federal authorities both “to communicate with the Attorney General regarding the immigration status of any individual” and “to cooperate with the Attorney General in the identification ... of aliens not lawfully present in the United States.” Id. § 1357(g)(10) (emphasis added). “We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The exclusion of illegal alien identification from the restraints of explicit written agreements under § 1357(g)(l)-(9), and the inclusion of this identification function in the state’s unrestrained rights under § 1357(g)(10), leads to the conclusion that Congress intended that state officers be free to inquire of the federal officers into the immigration status of any person, without any direction or supervision of such federal officers— and the federal officers “shall respond” to any such inquiry. 8 U.S.C. § 1373(c) (emphasis added).
Another limitation of authority inferred by the majority from § 1357(g)(10) seems to be that state authorities cannot order their officers to enforce immigration laws in every case where they have reasonable suspicion to believe the laws are being violated. The argument seems to be that while “incidental” investigation — motivated solely by the individual officer’s discretion — might be permissible and not an invasion of federal immigration turf, any systematic and mandatory order to identify illegal aliens would be an incursion into a preempted area. See Maj. Op. at 349-50; see also Oral Argument at 46:15-46:35 (“[T]he mandatory application [of Section 2(B) ] is impermissible, because it takes away the discretion of the local law enforcement officer to decide whether to pursue a particular line of inquiry rather than mandated.”). This reading of the statute is as original, and therefore, problematic as is utilizing the words “calls upon,” “necessity,” “systematic,” and “routine” to circumscribe an otherwise clear statute. First, by what authority can the federal government tell a state government what orders it is to give state police officers as to the intensity with which they should investigate breaches of federal immigration law? Other than pursuant to the provisions of written agreements, 8 U.S.C. § 1357(g)(l)-(9), I see no statutory basis for allowing the federal government to limit the effort the state can command of its officers. Rather, Congress intended the Attorney General to cooperate with state officers, 8 U.S.C. § 1357(g), and commanded him to answer their requests for immigration status checks, 8 U.S.C. § 1373(c). Second, how practical is it for a watch commander to instruct his deputies that it *379 is up to their whims as to when they can enforce federal immigration law?

C. Section 2(B)’s limited scope

Next, the majority seems to believe that when a state officer (1) initiates the identification of an illegal alien by checking the alien’s immigration status with federal officials pursuant to § 1373(c), and (2) has the alien identified to him by federal authorities, the state officer has somehow usurped the federal role of immigration enforcement. Maj. Op. at 349-50. Section 2(B)’s scope, however, is not so expansive. Section 2(B) does not purport to authorize Arizona officers to remove illegal aliens from the United States — Section 2(B) merely requires Arizona officers to inquire into the immigration status of suspected illegal aliens during an otherwise lawful encounter. See Section 2(B). Section 2(B) does not govern any other action taken by Arizona officers once they discover an alien is illegally present in the United States. Further, Section 2(B) does not require that ICE accept custody or initiate removal of the illegal alien from the United States. Federal authorities are merely obligated to respond to the immigration status inquiry pursuant to § 1373(c). Once this occurs, federal authorities are free to refuse additional cooperation offered by the state officers, and frankly to state their lack of interest in removing the illegal alien. The federal authorities can stop the illegal alien removal process at any point after responding to the state immigration status request.[12]
Although it is true that Section 2(B) requires Arizona officers to detain an arrestee suspected of being an illegal alien before releasing the alien, this does little to broaden Section 2(B)’s scope. First, because this is a facial challenge, we must assume that Arizona police officers will comply with federal law and the Constitution in executing Section 2(B). Second, Arizona has built a safeguard into Section 2 which requires that Section 2(B)’s immigration status checking mechanisms be executed in a manner consistent with federal law. See Section 2(L) (“This section shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens.”). Finally, it would be absurd to assume that Congress would permit states to check a person’s immigration status, see 8 U.S.C. § 1373(c), but would not allow the state to hold the suspected illegal alien until a response were received.
The majority also finds that state officers reporting illegal aliens to federal officers, Arizona would interfere with ICE’s “priorities and strategies.” Maj. Op. at 351. It is only by speaking in such important-sounding abstractions — “priorities and strategies” — that such an argument can be made palatable to the unquestioning. How can simply informing federal authorities of the presence of an illegal alien, which represents the full extent of Section 2(B)’s limited scope of state-federal interaction, possibly interfere with federal priorities and strategies — unless such priorities and strategies are to avoid learning of the presence of illegal aliens? What *380 would we say to a fire station which told its community not to report fires because such information would interfere with the fire station’s “priorities and strategies” for detecting and extinguishing fires?
The internal policies of ICE do not and cannot change this result. The power to preempt lies with Congress, not with the Executive; as such, an agency such as ICE can preempt state law only when such power has been delegated to it by Congress. See North Dakota v. United States, 495 U.S. 423, 442, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (“It is Congress — not the [Department of Defense] — that has the power to pre-empt otherwise valid state laws.... ”). Otherwise, evolving changes in federal “priorities and strategies” from year to year and from administration to administration would have the power to preempt state law, despite there being no new Congressional action. Courts would be required to analyze statutes anew to determine whether they conflict with the newest Executive policy. Although Congress did grant some discretion to the Attorney General in entering into agreements pursuant to § 1357(g), Congress explicitly withheld any discretion as to immigration status inquiries by “obligating]” the federal government to respond to state and local inquiries pursuant to § 1373(c) and by excepting communication regarding immigration status from the scope of the explicit written agreements created pursuant to § 1357(g)(10). Congress’s statutes provide for calls and order the calls be returned.

D. Supreme Court preemption cases

The Supreme Court’s decisions in Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), and Buckman Co. v. Plaintiffs’ Legal Committee, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), are in accord with the view that Section 2(B) is not preempted by federal law. As the majority points out, in each of those cases, the Supreme Court concluded that Congress intended to provide the Executive with flexibility when it enacted federal law, and that state law encroached on that flexibility. That is not the situation we face here. The majority errs by reading the flexibility Congress provided to the Attorney General in entering agreements pursuant to § 1357(g) as providing universal flexibility as to all immigration matters. Congress did just the opposite. As discussed above, Congress explicitly withheld administrative discretion and flexibility as to responses to state officers’ immigration status inquiries in both § 1373(c) and § 1357(g)(10). Federal authorities have no discretion whether they may respond to immigration status inquiries from state officials. 8 U.S.C. § 1373(c). State officials need not enter into a written agreement to communicate with the Attorney General regarding the immigration status of any individual. 8 U.S.C. § 1357(g)(10). Section 2(B) does not encroach on federal flexibility because Congress did not intend federal authorities to have any flexibility in providing states with properly requested immigration status information.
Neither does the Supreme Court’s preemption jurisprudence in the field of foreign relations change the conclusion that Section 2(B) is not preempted. In Crosby, Massachusetts passed a law which restricted state entities from buying goods or services from those doing business with Burma. 530 U.S. at 366-68, 120 S.Ct. 2288. Three months later, Congress passed a statute imposing a set of mandatory and conditional sanctions on Burma. Id. at 368, 120 S.Ct. 2288. The Court found that the Massachusetts law conflicted with several identified Congressional objectives. “First, Congress clearly intended the federal Act to provide the Pres *381 ident with flexible and effective authority over economic sanctions against Burma.” Id. at 374, 120 S.Ct. 2288. Second, “Congress manifestly intended to limit economic pressure against the Burmese Government to a specific range.” Id. at 377, 120 S.Ct. 2288. “Finally, ... the President’s intended authority to speak for the United States among the world’s nations in developing a ‘comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma.’ ” Id. at 380, 120 S.Ct. 2288. Thus, the Court concluded:
Because the state Act’s provisions conflict with Congress’s specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause.
Id. at 388, 120 S.Ct. 2288.
In American Insurance Ass’n v. Garamendi 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), President Clinton entered into an agreement with the German Chancellor in which Germany agreed to establish a foundation to compensate victims of German National Socialist companies. Id. at 405, 123 S.Ct. 2374. In exchange, the U.S. government agreed to discourage Holocaust-era claims in American courts and encourage state and local governments to respect the foundation as the exclusive mechanism for resolving these claims. Id. at 405-06, 123 S.Ct. 2374. Meanwhile, California passed legislation which required insurance companies doing business in the state to disclose the details of insurance policies issued to people in Europe between 1920 and 1945. Id. at 409, 123 S.Ct. 2374. The Court explained that “even ... the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law.” Id. at 420, 123 S.Ct. 2374. The Court held California’s law was preempted: “[T]he evidence here is ‘more than sufficient to demonstrate that the state Act stands in the way of [the President’s] diplomatic objectives.’ ” Id. at 427, 123 S.Ct. 2374 (quoting Crosby, 530 U.S. at 386, 120 S.Ct. 2288). That is, California’s law conflicted with specific foreign relations objectives of the Executive, as “addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century.” Id. at 421, 120 S.Ct. 2288.
Thus, as Crosby and Garamendi demonstrate, it is not simply any effect on foreign relations generally which leads to preemption, as the majority asserts. See Maj. Op. at 352-54. Instead, a state law is preempted because it conflicts with federal law only when the state law’s effect on foreign relations conflicts with federally established foreign relations goals. In Crosby, the state law conflicted with the degree of trade Congress decided to allow with Burma, and the discretion explicitly given to the Executive to make trade decisions. In Garamendi, the state law imposed an investigatory and litigation burden inconsistent with the rules the Executive Agreement had created. Here, however, there is no established foreign relations policy goal with which Section 2(B) may be claimed to conflict. The majority contends that Section 2(B) “thwarts the Executive’s ability to singularly manage the spillover effects of the nation’s immigration laws on foreign affairs.” Maj. Op. at 354.
First, the majority fails to identify a federal foreign relation policy which establishes the United States must avoid “spill *382 over effects,” if that term is meant to describe displeasure by foreign countries with the United States’ immigration policies. The majority would have us believe that Congress has provided the Executive with the power to veto any state law which happens to have some effect on foreign relations, as if Congress had not weighed that possible effect in enacting laws permitting state intervention in the immigration field. To the contrary, here Congress has established — through its enactment of statutes such as 8 U.S.C. §§ 1357(g)(10), 1373(c), and 1644 — a policy which encourages the free flow of immigration status information between federal and local governments. Arizona’s law embraces and furthers this federal policy; any negative effect on foreign relations caused by the free flow of immigration status information between Arizona and federal officials is due not to Arizona’s law, but to the laws of Congress. Second, the Executive’s desire to appease foreign governments’ complaints cannot override Congressionallymandated provisions — as to the free flow of immigration status information between states and federal authorities — on grounds of a claimed effect on foreign relations any more than could such a foreign relations claim override Congressional statutes for (1) who qualifies to acquire residency in the United States, 8 U.S.C. § 1154, or (2) who qualifies to become a United States citizen, 8 U.S.C. § 1421 et seq.
Finally, the majority errs in finding that the threat of all 50 states layering their own immigration rules on top of federal law weighs in favor of preemption. In Buckman, the Supreme Court stated: “As a practical matter, complying with the FDA’s detailed regulatory regime in the shadow of 50 States’ tort regimes will dramatically increase the burdens facing potential applicants burdens not contemplated by Congress in enacting the FDCA and the MDA” 531 U.S. at 350, 121 S.Ct. 1012 (emphasis added). I fail to see how Congress could have failed to contemplate that states would make use of the very statutory framework that Congress itself enacted. Congress created the Law Enforcement Support Center “to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis.” Congress also obligated ICE to respond to all immigration status inquiries from state and local authorities. 8 U.S.C. § 1373(c). In light of this, all 50 states enacting laws for inquiring into the immigration status of suspected illegal aliens is desired by Congress, and weighs against preemption.

Conclusion

As demonstrated above, Congress envisioned, intended, and encouraged intergovernmental cooperation between state and federal agencies, at least as to information regarding a person’s immigration status, for the proper and efficient enforcement of federal immigration law. While § 1357(g)(l)-(9) grants the Attorney General discretion to enter into written agreements deputizing and supervising state officers, § 1357(g)(10) explicitly recognizes an alternative to that regime, so as to encourage and facilitate the free flow of immigration status information provided for in § 1373(c). The majority’s arguments regarding how any of the state officers’ actions spelled out in Section 2(B) could interfere with federal immigration enforcement is consistent with only one premise: the complaining federal authorities do not want to enforce the immigration laws regarding the presence of illegal aliens, and do not want any help from the state of Arizona that would pressure federal officers to have to enforce those immigration laws. With respect, regardless what may be the intent of the Executive, I cannot accept this premise as accurately expressing the intent of Congress.

*383
II. Sections 3 and 5(C)

I concur with the majority that Section 3, which penalizes an alien’s failure to carry documentation as required by federal immigration statutes, impermissibly infringes on the federal government’s uniform, integrated, and comprehensive system of registration which leaves no room for its enforcement by the state. I also concur with the majority that Section 5(C), which penalizes an illegal alien for working or seeking work, conflicts with Congress’s intent to focus on employer penalties, an intent determined by this court in National Center for Immigrants’ Rights, Inc. v. I.N.S., 913 F.2d 1350 (9th Cir.1990), rev’d on other grounds, 502 U.S. 183, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). As a three-judge panel, we may not re-examine the conclusions reached in National Center. Miller v. Gammie, 335 F.3d 889 (9th Cir. 2003) (en banc); see also Newdow v. Lefevre, 598 F.3d 638, 644 (9th Cir.2010) (holding that Establishment Clause challenge to the placement of “In God We Trust” on coins and currency was foreclosed by Aronow v. United States, 432 F.2d 242 (9th Cir.1970)).
However, for the reasons discussed above as to Section 2, I disagree with the majority’s foreign-relations rationale. The majority fails to identify a foreign relations policy, established by Congress, with which Sections 3 and 5 conflict; a foreign nation may not cause a state law to be preempted simply by complaining about the law’s effects on foreign relations generally. We do not grant other nations’ foreign ministries a “heckler’s veto.”

III. Section 6

The majority’s analysis of S.B. 1070 Section 6[13] will come as a surprise to all parties involved in this case. It ignores the contentions in the filings before the district court, the district court’s rationale, the briefs filed in this court, and what was said by the well-prepared counsel, questioned at our oral argument. Indeed, it is an argument and conclusion volunteered by the majority, but carefully avoided by the United States — probably because it conflicts with the present policy of the Department of Justice’s Office of Legal Counsel. First, let us examine what I thought the parties put before us for decision.
The only contention made by the United States in this litigation with respect to Section 6 is that, due to the complexity inherent in determining whether a specific crime makes an alien removable, Arizona police officers will ineluctably burden legal aliens through erroneous warrantless arrests. Not a very strong contention at that, since counsel for the United States all but conceded this argument’s flaw as to this facial challenge at oral argument by admitting that Arizona police officers could very easily determine that some crimes, such as murder, would make an alien removable. Thus, the analysis of this section should have been simple — Section 6 was facially constitutional because a “set of circumstances” existed under which no “complexity” existed: an Arizona police officer comes across an alien convicted of murder; he is removable; he can be lawfully arrested. See Salerno, 481 U.S. at 745,107 S.Ct. 2095. So, Section 6 was not preempted. End of story.
Instead, the majority misrepresents Arizona’s attempt to assist the federal government as “unilaterally transforming] state *384 and local law enforcement officers into a state-controlled DHS force to carry out its declared policy of attrition.” Maj. Op. at 362. Section 6 is not, and could not, be so broad. Instead, Section 6 merely authorizes Arizona police officers to make warrantless arrests when they cooperate in the enforcement of federal immigration law — as invited to do by Congress. See 8 U.S.C. § 1357(g)(10).
For its newly-minted-but-not-argued position, the majority relies extensively on 8 U.S.C. § 1252c — a code section not cited in support by the United States[14] — misinterpreting its meaning and putting this circuit in direct conflict with the Tenth Circuit. The majority also ignores clear Supreme Court precedent and concludes that 8 U.S.C. § 1357(a)’s limitations as to federal warrantless arrest power implies a limitation on state officers. As I discuss below, the majority erred in concluding that state police officers have no authority to enforce the civil provisions of federal immigration law.
As noted by the majority opinion, Section 6 applies to three different scenarios: (1) when there is probable cause to believe a person committed a removable offense in a state other than Arizona; (2) when there is probable cause to believe that an individual committed a removable offense in Arizona, served his or her time for the crime, and was released; and (3) when there is probable cause to believe an individual committed a removable offense, but was not prosecuted. The question before us is whether warrantless arrests by state police officers in these three scenarios conflict with Congress’s intent.

A. Inherent authority of state officers to enforce federal immigration law

As an initial matter, it is notable that the United States never once asserted, either at oral argument or in its briefs, that Arizona officers are without the power to enforce the civil provisions of immigration law. Indeed, counsel for the United States at oral argument actually confirmed state officers’ authority to arrest aliens on the basis of civil removability. See Oral Argument at 58:40-59:40 (stating that Section 6 would be constitutional if it required Arizona officers to contact ICE regarding whether a crime renders an alien removable).[15] The United States’ argument against Section 6’s constitutionality was *385 limited to the “burden” that would be imposed on wrongfully arrested legal aliens due to the complexity of determining whether a certain crime makes an alien eligible for removal. Indeed, as the 2002 Department of Justice’s Office of Legal Counsel Opinion (“2002 OLC Opinion”) concludes, “the authority to arrest for violation of federal law inheres in the state, subject only to preemption by federal law.” See also Marsh v. United States, 29 F.2d 172 (2d Cir.1928) (“[I]t would be unreasonable to suppose that [the United States’] purpose was to deny to itself any help that the states may allow.”).[16]
The majority rejects the existence of this inherent state authority by citing one case from this court in which we “assumed” states lacked such authority. In Gonzales v. City of Peoria, this court held state police officers could enforce criminal provisions of the INA. 722 F.2d 468, 475 (9th Cir.1983), rev’d on other grounds, Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir.1999) (en banc). During its analysis, this court stated in dicta:
We assume that the civil provisions of the Act regulating authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration. However, this case does not concern that broad scheme, but only a narrow and distinct element of it — the regulation of criminal immigration activity by aliens.
Id. at 474-75 (emphasis added). The majority erred in simply accepting Gonzales’s assumption, in dicta, without performing any additional inquiry into whether it was indeed correct.[17]
The majority also missteps in relying on an abbreviated analysis in United States v. Urrieta, 520 F.3d 569 (6th Cir.2008). There, Urrieta moved to suppress items found in his car during an extended search by local police. Id. 572-73. Urrieta had been detained by a local police officer following the issuance of a traffic citation. Id. at 571-72. During the detention related to the traffic violation, the police officer attempted to determine whether Urrieta was an illegal alien. Id. The court concluded that suspicion of Urrieta’s illegal presence was insufficient to extend Urrieta’s detention. Id. at 574. In doing so, the court characterized 8 U.S.C. § 1357(g) as “stating that local law enforcement offi *386 cers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions that are not applicable in the present case.” Id.
This conclusion, however, completely ignored the existence and effect of § 1357(g)(10). As discussed fully throughout this dissent, subsection (g)(10) envisions state cooperation in the enforcement of federal immigration law outside the context of a specific agreement with the Attorney General by “identification, apprehension, detention, or removal” in cooperation with federal immigration authorities. Further, § 1357(g)(10) makes no distinction between criminal and civil provisions — indeed, it refers to “aliens not lawfully present in the United States.” 8 U.S.C. § 1357(g)(10)(B). The Sixth Circuit’s truncated conclusion may be based on the fact that the government withdrew the argument that Urrieta’s extended detention was justified on suspicion that he was an “undocumented immigrant” as “misstat[ing] the law.” Id. Thus, the majority should not have relied on the Sixth Circuit’s language in concluding that state officers lack inherent authority to enforce the civil provisions of immigration law any more than it should have relied on the language in Gonzales, and for the same reason: the issue whether a state officer had inherent authority to arrest a person for violation of a federal civil violation was simply not before either court.
Moreover, the majority ignores clear Supreme Court precedent in concluding that state officers cannot make warrantless arrests because federal immigration officers cannot make warrantless arrests under the same circumstances pursuant to 8 U.S.C. § 1357(a). Maj. Op. at 362. In United States v. DiRe, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), state officers arrested Di Re for knowingly possessing counterfeit gasoline ration coupons in violation of § 301 of the Second War Powers Act of 1942, a federal law. Id. at 582, 68 S.Ct. 222. Di Re challenged the search incident to the arrest. Id. The Supreme Court upheld the arrest, stating “that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity.” Id. at 589, 68 S.Ct. 222; accord Miller v. United States, 357 U.S. 301, 305, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (holding that when state peace officers arrest a person for violation of federal narcotics law, “the lawfulness of the arrest without warrant is to be determined by reference to state law”); Johnson v. United States, 333 U.S. 10, 15 n. 5, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (holding that when state peace officers arrest a person for violation of federal narcotics law, “[sjtate law determines the validity of arrests without warrant”). Thus, the authority of states to authorize warrantless arrests for violations of federal law is well established.[18]
The conclusion that state police officers have the inherent authority to enforce the civil provisions of federal immigration law is supported by Mena v. City of Simi Valley, 332 F.3d 1255 (9th Cir.2003). There, a police officer questioned a woman *387 about her immigration status. Id. at 1262. This court stated that “it [was] doubtful that the police officer had any authority to question Mena regarding her citizenship.” Id. at 1265 n. 15. The Supreme Court overruled this court and stated:
As the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.
Muehler v. Mena, 544 U.S. 93, 101, 125 S.Ct. 1465,161 L.Ed.2d 299 (2005) (emphasis added). Thus, the Supreme Court explicitly recognized — in one of our California cases — that state police officers have authority to question a suspect regarding his or her immigration status, directly contradicting the majority’s conclusion that state officers possess no inherent authority to enforce the civil provisions of immigration law.[19]

B. Non-preemption of states’ inherent enforcement authority

Next, the majority errs in finding that 8 U.S.C. § 1252c pre-empts this inherent state arrest authority. Despite § 1252c’s lack of any language which indicates an intent to limit state powers, the majority holds that § 1252c represents the full extent of the arrest power Congress intended — a contention the Tenth Circuit previously rejected. See United States v. Vasquez-Alvarez, 176 F.3d 1294 (10th Cir.1999), cert. denied, 528 U.S. 913, 120 S.Ct. 264, 145 L.Ed.2d 221 (1999); see also United States v. Santana-Garcia, 264 F.3d 1188, 1193 (10th Cir.2001). 8 U.S.C. § 1252c provides, in relevant part:
Notwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who—
(1) is an alien illegally present in the United States; and
(2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,
but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.
8 U.S.C. § 1252c(a). The majority concludes that because Section 6 would allow warrantless arrests in a broader set of circumstances than described in § 1252c, it therefore conflicts with Congress’s intent.
*388 The Tenth Circuit persuasively rejected this contention over a decade ago. In United States v. Vasquez-Alvarez, “Vasquez claimed that 8 U.S.C. § 1252c limited] the authority of state and local police officers, allowing such an officer to arrest an illegal alien only when the INS has confirmed, before the arrest, that the alien has previously been convicted of a felony and has, since that conviction, been deported or left the United States.” 176 F.3d at 1295.[20]
Unable to cite any text in § 1252c which would expressly or impliedly state an intention that § 1252c was meant to be the only authority for state police to arrest an alien for his unlawful presence in this country, nor any canon of statutory interpretation that would come to its aid — and ignoring a later statute’s recognition of the authority to detain (1357(g)(10)) — the majority appeals to legislative history. As noted by the majority, the only legislative history as to § 1252c is the floor debate that accompanied Representative Doolittle’s introduction of § 1252c. The Tenth Circuit analyzed the plain language of § 1252c as well as this legislative history, and rejected Vasquez’s claim:
This legislative history does not contain the slightest indication that Congress intended to displace any preexisting enforcement powers already in the hands of state and local officers. Accordingly, neither the text of the statute nor its legislative history support Vasquez’s claim that § 1252c expressly preempts state law.
Id. at 1299.
The majority takes a single Representative’s comment — that states lacked the authority to arrest illegal aliens and that § 1252c was needed to authorize such arrests — to conclude that Congress as a whole intended § 1252c to represent the limit of state arrest authority. Like the Tenth Circuit, however, I cannot conclude that Congress intended § 1252c to represent the outer bounds of state officers’ authority to arrest illegal aliens based solely on the comments of one Representative. As stated by the Tenth Circuit:
Representative Doolittle did not identify which “current Federal law” prohibited “State and local law enforcement officials from arresting and detaining criminal aliens.” Neither the United States nor Vasquez has identified any such preexisting law. Furthermore, this court has not been able to identify any pre-§ 1252c limitations on the powers of state and local officers to enforce federal law.
Id. at 1299 n. 4; see also United States v. Anderson, 895 F.2d 641, 647 (9th Cir.1990) (Kozinski, J., dissenting) (“[Legislative] history ... is seldom, if ever, even seen by most of the legislators at the time they cast their votes.”).[21] Further supporting *389 this conclusion is the text of § 1252c, which does not provide even the slightest indication that Congress intended to preempt otherwise inherent state arrest powers.
The Tenth Circuit went on to note that Congress subsequently “passed a series of provisions designed to encourage cooperation between the federal government and the states in the enforcement of federal immigration laws.” Vasquez-Alvarez, 176 F.3d at 1300. Notably, Congress passed 8 U.S.C. § 1357(g), discussed at length above, just five months later.[22] The Tenth Circuit found this code section “evince[d] a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws.” Id. The majority states that the Tenth Circuit erred in “interpret[ingj § 1357(g)(10) to mean that[a] ‘formal agreement [pursuant to § 1357(g)(l)-(9) ] is not necessary for state and local officers “to cooperate with the Attorney General in identification, apprehension, detention, or removal of aliens.” ’ ” Maj. Op. at 365 (emphasis added). It is no wonder that the Tenth Circuit so “interpreted” § 1357(g)(10), when that is what the statute explicitly says:
Nothing in this subsection [1357(g) ] shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State ... otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.
8 U.S.C. § 1357(g)(10)(B) (emphasis added). I cannot join the majority in criticizing the Tenth Circuit for merely reading the statute’s words.[23]
The majority contends that § 1357(g)(10) “neither grants, nor assumes the preexistence of, inherent state authority to enforce civil immigration laws in the absence of federal supervision.” Maj. Op. at 365. What, then, does § 1357(g)(10) do? We must read 1357(g)(10) in context of § 1357(g) as a whole. Section 1357(g) created, for the first time, the authority of the Attorney General to enter into agreements with states and localities to deputize their officers as 287(g) immigration officers. Subsections (g)(l)-(9) set out the specifics of the explicit written agreements — state officers are paid by the state, trained by the federal government, supervised by the Attorney General, and should be treated as federal employees for purposes of liability and immunity. However, § 1357(g)(10) states clearly that this new method of state involvement — 287(g) deputized officers — is not the only way state officers may cooperate in the enforcement of federal immigration law. Subsection (g)(10) preserves the preexisting authority of state officers to participate in enforcing immigration law, without the requirement of any formal, written agreement as envisioned by § 1357(g)(l)-(9).
Absent subsection (g)(10), one might argue that the authority created by § 1357(g)(l)-(9) to deputize state officers represents the full extent of state officer *390 immigration enforcement.[24] Instead, (g)(10) makes clear that state officers’ authority “otherwise to cooperate” in enforcing federal immigration law remained intact after the creation of the new “deputy track” of enforcement. This reading does not make § 1357(g) superfluous, as the majority contends. See Maj. Op. at 364-65. Indeed, this interpretation makes each part of § 1357(g) necessary — subsections (g)(l)-(9) are necessary to authorize the Attorney General to deputize 287(g) officers, and subsection (g)(10) is necessary to preserve state officers’ preexisting communication and arrest authority. The majority cannot explain how state officers may “otherwise cooperate” pursuant to § 1357(g)(10) — in such concrete areas as the “identification, apprehension, detention, [and] removal” of suspects — if they possess no inherent authority to enforce civil immigration law. The reason for this inconsistency is the majority’s antecedent error — finding state officers lack such inherent authority.
Neither does this interpretation render § 1252c superfluous, as the majority contends. See Maj. Op. at 364-65. Section 1252c’s “notwithstanding” language acts as a safeguard against other provisions of federal law, preventing any other provision from being construed to preempt state arrest authority to arrest certain illegal aliens. As stated by the 2002 OLC Opinion:
If, for example, a court were otherwise inclined (per the Ninth Circuit’s dicta in Gonzales [v. City of Peoria, 722 F.2d 468 (9th Cir.1983) ]) to misconstrue the provisions of the INA as preempting state authority to arrest for civil deport-ability, section 1252c would operate to ensure that state police at least retained the authority to make such arrests of aliens who had previously been convicted of a felony and had been deported or had left the United States after such conviction.
2002 OLC Opinion at 11. Moreover, Congress has authority to enact legislation which is designed merely to clarify, without affecting the distribution of power. See, e.g., Reaffirmation — Reference to One Nation Under God in the Pledge of Allegiance, Pub L. No. 107-293 (2002) (“An Act To reaffirm the reference to one Nation under God in the Pledge of Allegiance.” (emphasis added)). Thus, § 1252c does not become “superfluous” merely because it does not enlarge or shrink the arrest power provided to state police officers.[25]

Conclusion

In conclusion, Section 6 is not preempted and is constitutional. The United States all but conceded the only argument it made in this court and the court below. On the merits of the majority’s sua sponte suggestion that state officers can act in the immigration enforcement field pursuant *391 only to 8 U.S.C. § 1252c, familiar principles of dual sovereignty, as recognized by the Supreme Court, provide states with the inherent authority to enforce federal immigration law. In passing 8 U.S.C. § 1252c, a statement by the bill’s sponsor of what he thought was the preexisting state of the law is insufficient to establish that Congress as a whole intended to displace this preexisting authority vested in the states. Finally, 8 U.S.C. § 1357(g)(10), enacted after § 1252c, explicitly recognizes an authority reserved to the states to enforce federal immigration law outside the confines of a written agreement with the Attorney General. Section 6 does not conflict with the intent of Congress, and thus is not conflict preempted.

IV. Conclusion

The majority misreads the meaning of the relevant federal statutes to ignore what is plain in the statutes — Congress intended state and local police officers to participate in the enforcement of federal immigration law. Sections 2 and 6 do not conflict with this intent, and thus are constitutional.

. In August 2007, the attorney general of New Jersey issued a directive which stated:
When a local, county, or State law enforcement officer makes an arrest for any indictable crime, or for driving while intoxicated, the arresting officer or a designated officer, as part of the booking process, shall inquire about the arrestee’s citizenship, nationality and immigration status. If the officer has reason to believe that the person may not be lawfully present in the United States, the officer shall notify [ICE] during the arrest booking process.
Anne Milgram, Attorney General Law Enforcement Directive No.2007-3.

. Rhode Island Executive Order 08-01, "Illegal Immigration Control Order,” issued March 27, 2008, states at paragraph 6:

. "While some Members of the [Supreme] Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.’ " Wash. State Grange, 552 U.S. at 449, 128 S.Ct. 1184 (quoting Wash. v. Glucksberg, 521 U.S. 702, 739-40 & n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (Stevens, J., concurring in judgments)). The high facial challenge standard was reaffirmed just last term. See United States v. Stevens, - U.S. -, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010).

. Section 2(B) of S.B. 1070 provides in relevant part:
For any lawful stop, detention or arrest made by[an Arizona] law enforcement official or a law enforcement agency ... in the enforcement of any other law or ordinance of a county, city or town or this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person’s immigration status determined before the person is released. The person's immigration status shall be verified with the federal government pursuant to 8 United States Code section 1373(c) ... A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency any of the following:
1. A valid Arizona driver license.
2. A valid Arizona nonoperating identification license.
3. A valid tribal enrollment card or other form of tribal identification.
4. If the entity requires proof of legal presence in the United States before issuance, any valid United States federal, *372 state or local government issued identification.
Ariz.Rev.Stal. Ann. § 11-1051(B) (2010).

. The majority has apparently mastered its Lewis Carroll:
“I don’t know what you mean by ‘glory,’ ” Alice said.
Humpty Dumpty smiled contemptuously. "Of course you don't — till I tell you. I meant 'there’s a nice knock-down argument for you!’ ”
"But 'glory' doesn't mean 'a nice knockdown argument,' ” Alice objected.
“When / use a word,” Humpty Dumpty said, in rather a scornful tone, “it means just what I choose it to mean — neither more nor less.”
"The question is,” said Alice, "whether you can make words mean so many different things.”
"The question is,” said Humpty Dumpty, "which is to be master — that’s all.”
Lewis Carroll, Through the Looking Glass and What Alice Found There, in THE ANNOTATED ALICE: THE DEFINITIVE EDITION 213 (Martin Gardner ed., Norton Publishers) (2000).
I am disappointed the majority does not take Lewis Carroll’s humorous example of word traducing seriously to explain how the majority’s use of "nothing” in 8 U.S.C. § 1357(g)(10) could be made to mean "everything.”
'Twas the saying of an ancient sage that humour was the only test of gravity, and gravity of humour. For a subject which would not bear raillery was suspicious; and a jest which would not bear a serious examination was certainly false wit.
Anthony Cooper, Earl of Shaftesbury, Essay on the Freedom of Wit and Humour, sec. 5 (1709).
However, it is not accurate to imply that recourse to the estimable Humpty-Dumpty is to slip the bounds of judicial argument. A quick Westlaw search shows six mentions in Supreme Court opinions of Humpty Dumpty's views as to how the meanings of words can be changed, and another dozen in this court— including one case in which the author of the majority here concurred. See Scribner v. WorldCom, Inc., 249 F.3d 902 (9th Cir.2001).

. It is curious the majority opinion spends as much time as it does interpreting the language of Section 2(B) to be a mandate of immigration status checks of every arrestee, regardless whether there is reasonable suspicion he is an illegal alien — contrary to Arizona’s interpretation of its own statute. Maj. Op. at 347-48. That interpretation was used by the district court to conclude state actions would result in invasion of the federal province of immigration enforcement, by overburdening federal immigration status checking resources. The majority adopts the district court's statutory analysis of Section *373 2(B) — violating a slew of canons of statutory construction along the way — but fails to arrive at the district court's findings, findings thought necessary by the district court to conclude Section 2(B) was preempted. The district court incorrectly analyzed the Arizona statute to make its incorrect point that immigration inquiries will overburden federal resources. But at least it made a point. The majority trudges the same analytical trail, but goes nowhere. It rather gives the impression that a portion of the majority opinion has been left at the printer.
Of course, it is awkward indeed to argue that immigration status inquiries by state officials can "overburden” federal officials when 8 U.S.C. § 1373(c) reads so plainly ("The Immigration and Naturalization Service shall respond....” (emphasis added)). Had Congress wanted to give federal immigration officers discretion as to whether to answer such inquiries, it could have used "may” rather than "shall,” as it does in 8 U.S.C. § 1357(g)(1) regarding federal officials' discretion to enter into written agreements with the states regarding enforcement of immigration laws.

. The statute has not been amended to reflect that the Immigration and Naturalization Service ceased to exist in 2003. ICE, an agency within the Department of Homeland Security, now performs the immigration-related functions.

. Another example of federal authorization for state inquiries into an alien's immigration status is 8 U.S.C. § 1644, part of the 1996 Welfare Reform Act. This section states “Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States.” 8 U.S.C. § 1644. The House Conference Report accompanying the Welfare Reform Act explained: “The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens.... The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, *374 and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.” H.R. Conf. Rep. No. 104-725, at 383 (1996), reprinted in 1996 U.S.C.C.A.N. 2183, 2649, 2771. The title and placement of the statute seems to have more to do with helping states administer benefits than to achieve removals of illegal aliens. But the statute does reflect Congress's repeatedly stated intention to provide for the free flow of immigration status information between the states and the federal immigration establishment.

. We strive to read Congress’s enactments in a reasonable manner. Am. Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.”). Is the majority’s reading of § 1357(g)(10) reasonable? Imagine, for a moment, its implementation. Morning dawns at the Pima County (Tucson) Sheriff's Office. The watch commander assembles the deputies: "Officers, in your patrols and arrests today, please remember the Ninth Circuit has told us that if you encounter aliens you suspect are illegally present in this country, you may check their immigration status with federal immigration officers, and cooperate with federal agents in their identification, apprehension, detention and removal, but only (1) if called upon by the federal authorities to assist, or (2) absent such request, where necessary, but (3) then only on an incidental basis, and (4) not in a routine or systematic basis.” Officer Smith responds: "Commander, does that mean that, unless asked by the federal officers, we cannot determine immigration status of suspected illegal aliens from federal immigration officers or cooperate to help in their removal in each case in which we have reasonable suspicion, but, on the other hand, that we can do so when necessary, but then only once in a while? When will it be ’necessary’? Second, for every ten suspicious persons we run across, in how many cases are we allowed to request immigration checks and cooperate with the federal authorities without our immigration checks becoming systematic’ and ’routine,’ rather than merely 'incidental'?”
Rather than explain the content of the conditions which it invents — "called upon,” "necessity,” “systematic,” and "routine” — the majority turns up its nose at a scenario made all-loo-probable by its vague limitations; limitations themselves bereft of structure for lack of citation of authority. As in the case of its refusal to refute its traducing of statutory language (see footnote 5, supra), the majority declaims the impropriety of my criticisms, rather than discuss why they are wrong. But that does not shed any light on the question likely to be asked by the Sheriff's Deputy: "When can I detain a suspect to check his immigration status?”

. The majority contends its interpretation of § 1357(g)(10) is supported by 8 U.S.C. § 1103(a)(10). Section 1103(a)(l 0) empowers the Attorney General, in the event of a mass influx of aliens, to authorize state and local officers “to perform or exercise any of the powers, privileges, or duties” of a federal *376 immigration officer. 8 U.S.C. § 1103(a)(10) (emphasis added). That the Attorney General may designate state officers to exercise the full scope of federal immigration authority in such emergency situations — alone and not in cooperation with federal immigration officials — does not affect or limit state officers’ otherwise inherent authority under non-emergency circumstances “to cooperate with the Attorney General in the identification, apprehension, detention, or removal of [illegal] aliens,” 8 U.S.C. § 1357(g)(10)(B), especially by seeking immigration status information which federal authorities are obligated to provide, 8 U.S.C. § 1373(c). Nothing in the text of § 1357(g)(10), nor of § 1373(c), requires a prior "mass influx of aliens” to allow state officers to act. No case authority is cited for this peculiar instance of statutory interpretation.

. It is ironic that while construing Section 2(B) so as to make the second sentence thereof an independent mandate to run immigration checks on all arrestees, the majority does not apply the same canon to make § 1357(g)(10) independent, especially since § 1357(g)(10) begins with the classic language of a stand-alone, independent provision: "Nothing in this subsection shall be construed to require an agreement....”

. Of course, were the federal authorities to do just that — turn away the cooperation of state officials — they might be subject to criticism for not enforcing federal immigration law by failing to remove identified illegal aliens. Worse, since police departments tend to keep pesky records of communications, the exact amount of refusals of state assistance, and the future consequences of failing to remove illegal aliens, might make it into the Press, with perhaps embarrassing or impolitic results. These considerations, of course, should not affect the preemption analysis.

. S.B. 1070 Section 6 provides that "[a] peace officer, without a warrant, may arrest a person if the officer has probable cause to believe ... [t]he person to be arrested has committed any public offense that makes the person removable from the United States.” Ariz.Rev.Stat. Ann. § 13 — 3883(A)(5) (2010).

. Indeed, the total treatment of § 1252c in the briefs consists of a one-sentence citation in Arizona's brief arguing against Section 6’s preemption, and the United States’ citation, without argument, in a string cite in its statement of facts.

. Actual text from oral argument:
DEPUTY SOLICITOR GENERAL KNEEDLER: No, I think [Section 6] continues to present the problems that the [District] Court identified because there’s no requirement in Section 6 that the state or local officer contact ICE in order to find whether an offense is removable. The individual with, the officer would have to make a judgment as to whether the public offense in the other state was also a public offense in Arizona, and then determine whether it would in turn lead to a removal—
JUDGE NOONAN: But the response is like Judge Paez suggested earlier, second-degree murder is the crime.
DEPUTY SOLICITOR GENERAL KNEEDLER: Well, in some, in that situation, it would probably, you know, it would probably be possible to make that determination. JUDGE NOONAN: Then why, so it doesn't, you have a Salerno problem with respect to Section 6?
DEPUTY SOLICITOR GENERAL KNEEDLER: Well, I don't think so because there's no requirement to check with ICE, first of all, and the INA, that's that responsibility for making removability determinations in the Federal Government. There may be some situations in which something could be done otherwise.
(emphases added).

. The United States likely did not adopt the majority's § 1252c argument because the Department of Justice is required to comply with Opinions from the Office of Legal Counsel. Congressional Research Service, Authority of State and Local Police to Enforce Federal Immigration Law, Sept. 17, 2010, available at http ://www. ilw. com/immigrationdaily/news/ 2010,1104-crs.pdf ("[Office of Legal Counsel] opinions are generally viewed as providing binding interpretive guidance for executive agencies and reflecting the legal position of the executive branch....'').

. Gonzales’ dicta is not binding on this panel. In United States v. Johnson, 256 F.3d 895 (9th Cir.2001) (en banc), this court stated:
Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.
Id. at 915. Here, the Gonzales panel’s statement regarding the civil provisions was "made casually and without analysis”; indeed, the panel even admitted they "assume[d]” the conclusion. It takes no analysis to assume. Further, the statement on INA's civil provisions was "merely a prelude to another legal issue.” Immediately after making the statement, the panel noted that the "case d[id] not concern” the civil provisions. Therefore, this panel is not bound by the Gonzales court's assumption, in dicta, regarding the INA's civil provisions.

. Although it is true that the federal laws in these cases were criminal, rather than civil, the Supreme Court was careful to couch its holdings in terms of "federal laws” generally, without reference to whether such laws were criminal in nature. This court's holding in Gonzales that illegal presence, alone, is not a crime — recently reaffirmed by this court in Martinez-Medina v. Holder, - F.3d -, - (9th Cir.2011) — is inapposite. As discussed above, the question whether state and local officers could enforce civil immigration laws was not before the court in Gonzales, and therefore its “distinction” between criminal and civil immigration laws is inexistent. See Maj. Op. at 363 n. 22.

. The majority contends “Mena did not recognize that state officers can enforce federal civil immigration law with no federal supervision or involvement.” Maj. Op. at 363 n. 21. It is true that an INS officer was present when the state and local officers questioned Mena regarding her immigration status. However, the actions of the INS officer were not before the Court; it was the conduct of the state and local officers which the Court scrutinized. See Mena, 544 U.S. at 100-01, 125 S.Ct. 1465. Moreover, the Supreme Court did not state that the presence of an INS officer was required for the state and local officers to question Mena regarding her immigration status. Indeed, the Court in Mena did not even mention the presence of the INS officer in the portion of the opinion recognizing the state and local officers’ questioning was permissible. See id. So, the officer conduct the Court approved was the state and local officer conduct. For aught that appears, the federal officer was a bystander, not one who "called upon” the state officers for help. See supra pages 374-77.

. Again, Vasquez claimed that in his case. The United States has made no such claim here. See supra footnote 14.

. The majority contends it is hypocritical that I criticize the majority’s reliance on a single representative’s comments while supporting the Tenth Circuit’s approach in Vasquez-Alvarez — which also relied on this representative’s comments. To the extent the Tenth Circuit relied affirmatively on Rep. Doolittle's comments, I agree with the majority that such reliance was misguided. Nonetheless, the Tenth Circuit also noted what the legislative history failed to demonstrate: an intent to displace preexisting state arrest authority. See Vasquez-Alvarez, 176 F.3d at 1299 & n. 4. Conflict preemption requires a determination that Congress’s intent conflicts with the state law in question. This requires, first, determining Congress’s intent. Was it Congress’s intent not to remove aliens illegally present in this country? The inability to discern an incompatible intent is fatal to the United States' preemption claim.

. 8 U.S.C. § 1644 was passed four months after § 1252c, and one month before § 1357(g). Section 1373(c) was passed at the same time as § 1357(g).

. But I can criticize the majority for initiating a needless circuit split between our court and the Tenth Circuit, contrary to our own declared preference to avoid such circuit splits. See, e.g., United States v. Alexander, 287 F.3d 811 (9th Cir.2002) ("[Ajbsent a strong reason to do so, we will not create a direct conflict with other circuits." (quoting United States v. Chavez-Vernaza, 844 F.2d 1368, 1374 (9th Cir. 1987))).

. Indeed, this is what the majority does even with the presence of § 1357(g)(10).

. The majority criticizes my use of the 2002 OLC Opinion. Maj. Op. at 365 n. 24. I agree with the majority’s assertion that the OLC Opinion does not bind this court. I quote it, however, not for its authority, but to rebut the majority’s contention that § 1252c is superfluous.
The majority is correct that the legislative history accompanying § 1252c does not con-lain reaffirming language like that found in Reaffirmation — Reference to One Nation Under God in the Pledge of Allegiance, Pub L. No. 107-293 (2002). Indeed, § 1252c's legislative history contains nothing more than the floor debate discussed previously. Again, the point of this citation is simply to demonstrate the various, non-superfluous motivations for Congressional action which do not explicitly alter the status quo.